894 A.2d 621

**STATE BOARD OF PHYSICIANS**

v.

Steven **BERNSTEIN.**

No. 1594, Sept. Term, 2004.

Court of Special Appeals of Maryland.

March 8, 2006.

716

Thomas W. Keech (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

M. Natalie McSherry (Whiteford, Taylor & Preston, LLP, on brief), Towson, for appellee.

Panel DAVIS, DEBORAH S. EYLER and KRAUSER, JJ.

DEBORAH S. EYLER, J.

The Maryland Board of Physicians ("Board"), the appellant, challenges a judgment of the Circuit Court for Baltimore County reversing the Board's decision reprimanding Steven Bernstein, M.D., the appellee, for failing to comply with appropriate standards of care.

The Board presents two questions for review, which we have consolidated into one: Was the Board's decision supported by substantial evidence in the agency record? [1]

For the following reasons, we shall vacate the decision of the circuit court, and remand the matter to that court with instructions to remand the matter to the Board for further proceedings not inconsistent with this opinion.

## STATUTORY SCHEME

Before recounting the facts, we shall review the process used by the Board to investigate and adjudicate complaints against physicians.

Physicians in Maryland are governed by the Medical Practices Act ("the Act"), Md.Code (1982, 2000 Repl.Vol.), section 14–101 *et seq.* of the Health Occupations Article ("HO"). At the pertinent time in the case, the Act was administered by a 15-member Board.[2] HO § 14–202(a). The Board, comprised

---

1. The questions as stated by the Board are:

 1. In a board disciplinary case involving a physician's alleged failure to meet the standard of "quality medical and surgical care," may the Board "use its experience, technical competence and specialized knowledge" under Md. State Gov't Code Ann. § 10–213(i) to choose which expert witness's opinion correctly elucidated the appropriate standard of quality care?

 2. Did the Board have the discretion to use its expertise to reject an ALJ's proposed decision which adopted the defense experts' opinions on the standard of care, when both of those experts: (1) based their opinions on reasons of business convenience and financial considerations; (2) denied that the issue was a medical standard of care issue at all; (3) did not in their own practices utilize the standard of care they espoused; and (4) testified only vaguely about the practices of other practitioners in the community?

2. Chapter 252, Acts 2003, effective July 1, 2003, made several changes to the structure of the Board. Prior to that date, the Board was known

of physicians and consumers, is responsible for the licensure and discipline of physicians in Maryland. It has adopted regulations governing the disciplinary process that are codified in the Code of Maryland Regulations ("COMAR") 10.32.02.

The Act authorizes the Board to reprimand a licensed physician, place a licensee on probation, or suspend or revoke a license to practice medicine for enumerated reasons, including the failure "to meet appropriate standards as determined by appropriate peer review for the delivery of quality medical and surgical care performed in an outpatient surgical facility, office, hospital, or any other location" in Maryland. HO § 14–404(a)(22).

When an allegation that may constitute grounds for disciplinary action under the Act comes to the Board's attention, the Board generally initiates an investigation. HO § 14–401(a); COMAR 10.32.02.03A. If the allegation concerns the standard of care and, after an investigation, the Board elects to pursue further investigation, the Board then refers the complaint to the Medical and Chirurgical Faculty of Maryland ("Med Chi") physician peer review. HO § 14–401(c)(2); COMAR 10.32.02.03(B)(1).

The Board and Med Chi have adopted a "Peer Review Handbook" that governs the peer review process. Med Chi prepares a report addressing the allegations against the physician and submits it to the Board.

After receiving the Med Chi report, the Board determines whether reasonable cause exists to charge the physician with a failure to meet appropriate standards of care. COMAR 10.32.02.03(B)(2). If the Board files a charge, it refers the matter to an administrative prosecutor and sends notice to the physician. COMAR 10.32.02.03(C)

---

as the State Board of Physician Quality Assurance. The 2003 legislation also raised the number of Board members from 15 to 21. All discussions of the framework of the Board disciplinary process will refer to the statutory provisions as they existed before the 2003 changes.

At that point, the physician is entitled to a contested case hearing before an administrative law judge ("ALJ"), in the Office of Administrative Hearings ("OAH"), pursuant to the Administrative Procedure Act, Md.Code (1984, 1999 Repl. Vol.), section 10–201 *et seq.* of the State Government Article ("SG"). HO § 14–405(a); *see also* COMAR 10.32.02.03(D). Following the hearing, the ALJ issues findings of fact, conclusions of law, and a proposed disposition. COMAR 10.32.02.03(E)(10). When the charge against the physician is failure to meet appropriate standards under HO section 14–404(a)(22), the standard of proof is clear and convincing evidence. HO § 14–105(a)(3).

Either party may file exceptions to the ALJ's findings and proposed disposition. COMAR 10.32.02.03(F).

The Board is not bound by the decision of the ALJ. *Compare* Md.Code (1994, 2005 Repl.Vol.), § 11–110 of the State Personnel and Pensions Article (providing that "the decision of [OAH] is the final administrative action"). After receiving the ALJ's proposed decision, the Board must review the record and the ALJ's proposal, and hold a hearing on any exceptions. COMAR 10.32.02.03(F). It then issues a final decision stating its findings of facts, conclusions of law, and a disposition of the charge. COMAR 10.32.02.03(E)(10).

The Board's final decision is subject to judicial review in the circuit court in accordance with the Administrative Procedure Act, and then to appeal to this Court. HO § 14–408(b).

## FACTS

The basic, first-level facts in this case are not in dispute.

The appellee is a Board-certified anesthesiologist. He obtained his undergraduate degree from the University of Maryland in 1979 and his medical degree from The John Hopkins Medical School in 1983. He completed a residency in anesthesiology at The John Hopkins Hospital in 1986, and a fellowship in anesthesiology, also at Hopkins, in 1987. When the events in this case happened, he was an employee of Parkway Anes-

thesia, the anesthesiology group for Union Memorial Hospital in Baltimore.

On October 12, 1998, in the afternoon, Patient A, an 82–year–old woman, was transported to Union Memorial's emergency room after she fell off a small stool at her home, injuring herself. She had a past medical history of colon cancer treated by resection and chemotherapy beginning in April of that year. She was diagnosed with a fractured left hip and admitted to the hospital at about 5 p.m.

Patient A was evaluated by Frank Ebert, M.D., an orthopedic surgeon, who recommended a left total hip replacement. The surgery was scheduled for the following evening, October 13, 1998.

The appellee was the anesthesiologist on call at Union Memorial from 3 p.m. on October 13 until the next morning. Thomas Davis, a certified registered nurse anesthetist ("CRNA"), also was on call. Davis was the chief nurse anesthetist at Union Memorial and had worked as a CRNA for about 30 years. The appellee had worked with Davis since 1987. A second CRNA, whose name is not disclosed in the record, and had no involvement in Patient A's case, also was on duty.

An EKG and chest X-ray taken prior to surgery showed that Patient A had a normal sinus rhythm with a rate of 82, a left axis deviation, and some premature ventricular contractions ("PVCs"). She had a blood oxygen saturation ("SaO2") of 92.5%. The EKG also showed the possibility of a past myocardial infarction, i.e., "heart attack," sometime after her evaluation in April 1998. Patient A's partial thromboplastin time ("PTT"), or measure of blood coagulation, was 20, which is low.

Dr. Waiel Samara, an internist, examined A and cleared her for surgery. He found "no evidence of acute cardiac event." He also found that she was "hemodynamically stable, asymptomatic," and that there was "no need for any intervention." He noted that Patient A had PVCs. He did not remark on the possibility of a past myocardial infarction. An orthopedic

admission physician also performed a preoperative evaluation. He noted that he had counseled Patient A and her son about the risks of the surgery.

CRNA Davis examined Patient A on the evening of the surgery, at about 7:30 p.m. He completed a form entitled "anesthesia evaluation and post anesthesia record." The form reflects that Davis reviewed Patient A's chart, discussed general anesthesia with Patient A and her daughter, and then obtained informed consent. Patient A and her daughter signed a "consent to anesthesia form," stating, "I authorize and consent to the provision of anesthesia service(s) by _____ or other members of the Department of Anesthesiology." Davis wrote his name and "CRNA" in the blank. The form listed the risks of general anesthesia and noted that Patient A's risk of potential blood loss was "moderate." Davis did not note Patient A's SaO2 on the form.

Davis assigned Patient A an ASA rating of three, which means that she had disease processes that were not well controlled and that her potential for complications resulting from anesthesia was increased over normal. The ASA rating is based on the patient's overall health.

The appellee did not examine Patient A or review her chart prior to the surgery.

At approximately 7:15 p.m., the appellee was providing anesthesia services to another patient. Dr. Peter Mulaikal, another anesthesiologist, told him that there were two cases remaining for surgery that evening: an emergency appendectomy and Patient A's hip replacement. Dr. Mulaikal agreed to work on the appendectomy. Davis was assigned to Patient A.

After the appellee was finished treating the patient he was assigned to, at 7:45 p.m., he went to the room where Dr. Mulaikal was working on the appendectomy, to relieve him. While the appellee was working on the appendectomy, Davis came into the operating room to discuss his evaluation of Patient A and her anesthesia plan. The discussion lasted about a minute. The appellee approved the plan but did not

read Patient A's chart. Davis did not discuss Dr. Samara's evaluation with the appellee.

At approximately 8:00 p.m., Davis administered the anesthesia to Patient A. During induction, Patient A's blood pressure dropped from 145/65 to 105/45. Davis administered medication to raise Patient A's blood pressure. After 10 to 15 minutes, her blood pressure rose to 150/68.

During the surgery, Patient A experienced significant blood loss. Davis requested blood from the hospital's blood bank but compatible blood was not immediately available. Patient A experienced additional periods of hypotension, with her blood pressure dropping as low as 85/40, at 9:20 p.m. She also experienced tachycardia, which is an abnormally elevated heart rate.

The appellee finished providing services to the appendectomy patient at around 9:00 p.m. He went to have dinner in the operating room lounge, which is down the hall and around the corner from Patient A's operating room, about a 30 second walk. He stayed in the lounge for about an hour. At 10 p.m., he went to Patient A's operating room "as a matter of courtesy" and because he expected the surgery would be finishing about that time.

As soon as the appellee entered the operating room, he became aware of Patient A's elevated heart rate and her relatively low blood pressure. Davis was checking Patient A's urine output. He informed the appellee that Patient A had suffered blood loss and that blood was not immediately available for transfusion. Davis already had started a second IV for additional fluid support, had administered a blood volume expander, and had given Patient A medication to elevate her blood pressure.

The blood for transfusion arrived in the operating room shortly after the appellee's arrival. Davis administered the blood to Patient A at 10:00 p.m. The appellee monitored

Patient A's vital signs and gave her additional medications. The appellee and Davis both were in the operating room for the rest of the surgery, including extubation.[3] By the time Patient A was transferred to the recovery room, at 10:50 p.m., her heart rate and blood pressure both were within the normal range. The appellee and Davis stayed in the recovery room with Patient A for about 15 minutes.

Shortly after midnight, a recovery room nurse contacted the appellee to inform him that Patient A seemed slow to arouse. The appellee observed that, although Patient A's vital signs were stable, it took a fair amount of stimulation to arouse her and she could not speak. The appellee administered a medication to counteract the effect of narcotics. Patient A then was able to move all of her extremities but still could not speak. The appellee transferred Patient A to a "step down unit" for continued observation. The transfer took place at about 1:00 a.m.

The appellee returned to see Patient A at 6:30 a.m. Her vital signs remained stable and there was no change in her neurological status. Because the effect of the narcotics no longer could be considered as contributing to her neurological status, he requested a neurological consultation. He did not provide any additional care to Patient A after his morning visit on October 14.

On October 15, a cardiologist diagnosed the appellee's condition as "probable CNS [central nervous system] changes including possible left parietal cerebrovascular accident[,]" i.e., a "stroke." He opined that these changes may have "been the initiating factor in her fall from the stool or ... may have come secondary to her anemia and hypotension from her surgical procedure."

---

**3.** Whether the appellee was present during extubation and emergence was in dispute at the administrative hearing. The appellee testified that he was present. In its decision, the Board accepted that the appellee in fact was present.

## PROCEEDINGS

### Complaint and Charges

On December 16, 1998, Patient A's son filed a complaint with the Board, alleging that the appellee had "committed acts of negligence and medical malpractice" by, among other things, "fail[ing] to provide close supervision of the CRNA administering [Patient A's] anesthesia[.]" The appellee, through counsel, responded to the complaint, stating that he had provided appropriate supervision during the anesthetic management of the case and had met the accepted standards of care in all respects.

On September 10, 1999, the Board asked Med Chi to conduct a peer review of the case. Two peer reviewers, Robert Lyles, M.D., and Dennis Forbes, M.D., independently reviewed the complaint, the appellee's response, and Patient A's medical records. Both reviewers are Board certified in anesthesiology.

On November 28, 1999, Dr. Lyles mailed his report to Med Chi. In it, he summarized the events surrounding Patient A's hip replacement surgery. Noting that the appellee was the "responsible anesthesiologist providing medical direction, supervising Mr. Davis," he concluded that the appellee had breached the standard of care by failing to participate in Patient A's care preoperatively or perioperatively, and that Davis "was permitted to assume what may be even considered independent responsibility for the anesthesia care of [Patient A]."

One month later, on December 30, Dr. Forbes submitted his report to Med Chi. Dr. Forbes concluded that, overall, Patient A had "received anesthesia care that met the necessary standard of care." However, like Dr. Lyles, he concluded that the appellee had not provided the required degree of medical supervision of Davis.

On January 27, 2000, Med Chi submitted the peer review committee's report to the Board. The report summarized both Dr. Lyles's and Dr. Forbes's reviews and concluded,

"The reviewers concur that [the appellee] breached the standard of care in the supervision of a CRNA in this case."

On November 22, 2000, the Board brought charges against the appellee under HO section 14–104(a)(22), with respect to his treatment of Patient A.[4] The statement of charges listed thirteen failures to meet the standard of care:

a. Failure to perform a physician preoperative anesthesia evaluation and examination of Patient A including review of laboratory orders, EKG, chest x-ray;

b. Failure to supervise the CRNA including reviewing the CRNA's evaluation and possibly ordering a specialty specific cardiac evaluation, ordering further laboratory testing regarding SaO2 status and possibly deferring surgery, as part of the pre-anesthesia date base;

c. Failure to prescribe a plan for anesthesia and to discuss the anesthesia plan with the CRNA;

d. Failure to discuss alternative methods of anesthesia (*general v. regional*) with Patient A;

e. Failure to obtain Patient A's informed consent to general anesthesiology;

f. Failure to be present during induction of Patient A;

g. Failure to be physically available to the CRNA for supervision in anticipation of anesthetic risks such as adverse cardiac and neurological sequelae during surgery;

h. Failure to be physically available to the CRNA for supervision in anticipation of anesthetic risks attributed to Patient A's low SaO2 as noted in the preoperative laboratory work-up;

i. Failure to be physically available to the CRNA to provide diligent, anticipatory, and knowledgeable medical management of Patient A during surgery to lessen the

4. The Board had voted to charge the appellee under HO section 14–404(a)(22) on April 26, 2000.

anesthetic risks with appropriate consultation and intervention;

j. Failure to be physically available to the CRNA to provide immediate anticipatory vascular volume replacement therapy for Patient A with early anticipatory intervention;

k. Failure to be physically available to the CRNA to provide full vascular volume replacement during Patient A's surgery;

l. Failure to be present during reversal of anesthesia and extubation and during Patient A's emergence from anesthesia; and

m. Permitting himself to be the anesthesiologist of record for Patient A at a time when he was not able to be physically available and to provide proper supervision for the CRNA; or, conversely failing to decline to be the anesthesiologist of record for Patient A at a time when he was not able to be physically available to provide proper supervision for the CRNA.

The statement of charges summarized the events surrounding Patient A's surgery and directed the Office of Administrative Hearings to hold a contested case hearing on the matter.

### Administrative Hearing

A contested case hearing was held before an ALJ on May 22, 23, and 24, 2001. The focus of the hearing was expert testimony about the appropriate standard of care.

### Exhibits

The Board introduced 17 exhibits, including Patient A's medical records; the Union Memorial Policy on the Anesthesiologist–Nurse Anesthetist Relationship; the Union Memorial Policy on Major Duties and Responsibilities of Nurse Anesthetists; the curricula vitae of the Board's experts; and several documents by the American Society of Anesthesiologists ("ASA"). The ASA is a national professional organization of

anesthesiologists that has a membership of approximately 30,000.

The first ASA document, "Guidelines for Patient Care in Anesthesiology," defines the practice of anesthesiology, sets forth the responsibilities of anesthesiologists, and describes the role of the anesthesiologist at each stage of surgery. It states:

Anesthesiologists' responsibilities to patients should include:

A. Preanesthetic evaluation and treatment;

B. Medical management of patients and their anesthetic procedures;

C. Postanesthetic evaluation and treatment;

D. On-site medical direction of any nonphysician who assists in the technical aspects of anesthesia care to the patient.

The second ASA document, "Guidelines for the Ethical Practice of Anesthesiology," summarizes the ethical responsibilities of anesthesiologists. It defines "medical direction" as

[A]nesthesia direction, management or instruction provided by an anesthesiologist whose responsibilities include:

a. Preanesthetic evaluation of the patient.

b. Prescription of the anesthesia plan.

c. Personal participation in the most demanding procedures in this plan, especially those of induction and emergence.

d. Following the course of anesthesia administration at frequent intervals.

e. Remaining physically available for the immediate diagnosis and treatment of emergencies.

f. Providing indicated postanesthesia care.

An anesthesiologist engaged in medical direction should not personally be administering another anesthetic and should use sound judgment in initiating other concurrent anesthetic and emergency procedures.

The final ASA document, "The Anesthesia Care Team," is a position statement. A position statement represents the opinion of the ASA House of Delegates, but is not subject to the same level of scientific scrutiny as an ASA standard or guideline. "The Anesthesia Care Team" statement provides, "Certain aspects of anesthesia care may be delegated to other properly trained professionals. These professionals, *medically directed* by the anesthesiologist, comprises [sic] the Anesthesia Care Team." (Emphasis added.) It then repeats the definition of "medical direction" found in the Guidelines for the Ethical Practice of Anesthesiology.

The Union Memorial Policy on "The Anesthesiologist–Nurse Anesthetist Relationship" states:

Whenever a [CRNA] administers anesthesia alone or under the supervision of an Anesthesiologist, the medical responsibility is still that of the Anesthesiologist.

The Anesthesiologist is responsible for:

1. Discussing the patient condition and prescribing a plan for that anesthesia with the [CRNA].

2. Being physically available in the most demanding procedures in this plan. Specifically those of induction and emergence when indicated.

3. Remaining physically available for diagnosis and treatment of emergencies.

4. Providing any indicated post-anesthesia care.

The Union Memorial Policy on "Major Duties and Responsibilities of Nurse Anesthetists" describes the specific duties of the CRNA in the following areas:

1) Administers anesthesia for cases as assigned by the Anesthesia Coordinator.

2) Performs Preoperative Assessments.

3) Inspects equipment prior to administering anesthesia.

4) Provides intraoperative management consistent with accepted [American Association of Nurse Anesthetists], ASA standards and Departmental Policies.

5) Maintains complete and accurate records of anesthetic management.

6) Provide for safe transition from [operating room] to [post anesthesia care unit].

7) Provide verbal report pertinent to the surgical procedure and anesthetic management to PACU personnel.

9) Follow Departmental Safety Standards.

The appellee introduced 7 exhibits, including COMAR 10.27.06, part of the Maryland Nursing Board regulations; the bill for the anesthesia services provided to Patient A; the billing regulations devised by Health Care Finance Administration's ("HCFA"), the federal agency in charge of Medicare payments; the curricula vitae of his expert witnesses; several Maryland House of Delegates bills; and a May 2001 newsletter from the Maryland Society of Anesthesiologists ("MSA").[5]

COMAR 10.27.06, entitled "Practice of Nurse Anesthetist," lists the responsibilities of CRNAs. It defines the practice of nurse anesthesia as "the performance of acts in collaboration with an anesthesiologist, licensed physician, or dentist, which require substantial specialized knowledge, judgment, and skill related to the administration of anesthesia[.]" COMAR 10.27.06.01(B)(9). It further provides that "[a]n anesthesiologist, licensed physician, or dentist shall be *physically available* to the nurse anesthetist for consultation at all times during the administration of, and recovery from, anesthesia." COMAR 10.27.06.06(A)(1) (emphasis added).

House Bill 986 of the 2001 session of the General Assembly would have added to the Health Occupations Article a section defining the word "collaboration" and required that a physician be on site to supervise a CRNA while anesthesia is being administered. The MSA supported that bill, but the Maryland Nursing Board opposed it. The bill did not pass.

---

5. Prior to 2003, the Maryland and District of Columbia Society of Anesthesiologists was a single society. They are now two separate societies. For ease of reference, we will use only the term "MSA."

### Expert Testimony for the Board

The Board called Drs. Lyles and Forbes as expert witnesses. Both were qualified as experts in the field of anesthesiology.

Dr. Lyles received his Ph.D. in materials engineering prior to obtaining his medical degree from the University of Juarez in Mexico in 1981. He worked as an attending anesthesiologist at University of Maryland Shock Trauma from 1984 to 1987 and then as the Chief of Anesthesiology at Jefferson Hospital in Alexandria, Virginia from 1987 to 1992. From 1990 to 2000, he served as the Chief of Anesthesiology at Doctors Community Hospital in Lanham. He worked with CRNAs at all three hospitals, although Doctors Hospital stopped using CRNAs in 1995. At the time of the hearing, he had not held admitting privileges at any Maryland hospital for 18 months.

Dr. Lyles has served as President of the MSA. At the time of the hearing, he was representing the MSA on the Board Office Surgery Committee and was serving on the Med Chi and the MSA legislative committees. Dr. Lyles also is a member of numerous professional organizations. His curriculum vitae cites roughly 300 publications and presentations related to medical topics and the subject of his Ph.D.

Dr. Lyles testified that, in drafting his peer review report in this matter, he referred to various "guidelines and standards" from the ASA.

Dr. Lyles opined that the standard of care required the appellee 1) to be physically involved in the pre-operative evaluation of Patient A, as opposed to merely delegating that duty to Davis; 2) to personally explain the risks of anesthesia and the alternatives to Patient A; 3) to be present during Patient A's induction; 4) to check on Patient A approximately every hour during the surgery; 5) to be physically available to come to Davis's aid; and 6) to be present during emergence and extubation of Patient A. He further opined that, in the case of a patient with an ASA 3 rating, "the supervising anesthesiologist ... would be more diligent, more anticipato-

ry, accumulate maybe a larger, more sufficient database with an ASA 3 than you would with an ASA 1 or ASA 2," because he "may have to control [the ongoing] disease processes during the anesthetic." He also stated that Patient A's SaO2 level of 92.5 was "low" and that the appellee should have addressed it in a preanesthesia evaluation. Further, Dr. Lyles testified that, given the combination of Patient A's low SaO2, her PVCs, the possibility of her having had a myocardial infarction, her low PTT, and the changes from her April 1998 evaluation, a "cardiac evaluation by the anesthesiologist[ ] would be reasonable."

Dr. Lyles concluded his testimony on direct examination by opining that the appellee had breached the standard of care by failing to conduct the preanesthetic evaluation, by not being present and available during the administration of anesthesia, and by not being present when the Patient A suffered an adverse event.[6]

On cross-examination, Dr. Lyles acknowledged that the ASA document entitled "Anesthesia Care Team," which he relied upon in drafting his peer review report, is not an actual guideline or standard, but a position statement. He opined that the Union Memorial policy on the major duties of nurse anesthetists is contrary to generally accepted standards of medical care. He stated that, in contrast to what the Union Memorial policy permits, an anesthesiologist must "personally participate" in the preoperative assessment, induction, and emergence of his patient.

Counsel for the appellee questioned Dr. Lyles about the billing system devised by HCFA, the federal agency overseeing Medicare. Dr. Lyles testified that, in order to bill HCFA for medical services, an anesthesiologist must provide services consistent with the ASA Guidelines for the Ethical Practice of Anesthesiology. If he provides services that do not meet the

---

6. Dr. Lyles also testified that the appellee breached the standard of care by not being present when Patient A was extubated and transferred to the recovery room. As discussed above, there was no evidence that the appellee was absent, and the ultimate finding was that he *was* present.

medical direction criteria, he may bill for services by use of the "QZ modifier." Dr. Lyles testified that, even though HFCA recognizes and specifically provides for a lesser degree of anesthesiologist involvement than medical direction, billing HCFA through the QZ modifier is "fraudulent" because it is inconsistent with state medical standards. He opined that "any physician in the State of Maryland who collaborates with a CRNA in the provision of anesthesia services in a manner inconsistent with medical direction is in violation of the standard of care."

Counsel further questioned Dr. Lyles about an article he wrote for the May 2001 newsletter of the MSA, in which he stated, "A high degree of variability exists in the individual supervision/collaboration agreements with regard to the definition of clinical responsibilities and duties." Dr. Lyles testified that he did not have personal knowledge of "different ways of collaborating with CRNAs" because the collaboration agreements he has had with CRNAs "have all been standard agreements."

Dr. Lyles also was questioned about House Bill 986. The appellee's counsel confronted Dr. Lyles with the fact that the Maryland Nursing Board had opposed the bill because it "has interpreted the 'physical availability' supervision requirement [in COMAR 10.27.06] to mean that the collaborating physician should be 'available in person or by telephone and able to reach the site should his/her presence be required.' " Despite the language of House Bill 986 and the Nursing Board's interpretation of COMAR 10.27.06, Dr. Lyles asserted that "the only acceptable mode [of collaboration] allowed by the standard of care in Maryland . . . is that described in the ASA [position statement]." He agreed that the question of the "necessary level of supervision for CRNAs" by anesthesiologists is a "hot topic" nationwide and in Maryland and that, through his activities with Med Chi and the MSA, he is active in that debate. He further acknowledged having testified on behalf of Med Chi in support of House Bill 986.

On re-direct examination, Dr. Lyles was asked about his statement in the MSA newsletter that "a high degree of variability exists in ... collaboration agreements." He clarified the statement by explaining that "the nurse at shock trauma might have very different duties and responsibilities than the nurse anesthetist at, say, a surgery center because of the severity and illness of the patient."

Dr. Forbes testified by telephone from Salisbury. He received his medical degree in 1978 from the Medical College of Virginia, where he later completed residencies in anesthesiology and internal medicine. At the time, the Medical College of Virginia was a training facility for CRNAs. He then worked as both the Assistant Chief and the Chief of the Department of Anesthesia at Peninsula Regional Medical Center ("PRMC") in Salisbury.

At the time of the hearing, Dr. Forbes had been in private practice in Salisbury since 1989, and was the Head of Quality Assurance at PRMC. PRMC had 12 anesthesiologists and CRNAs on staff. Dr. Forbes worked with CRNAs twice a month.

Dr. Forbes testified that his understanding of the standard of care comes from his training at the Medical College of Virginia and his private practice in Salisbury. He opined that the ASA "standards" are not mandatory but have become "standards de facto by the practice that we've chosen to adhere to and the practice that I understand it to be that which occurs in the majority of ... Maryland" and the rest of the country. In his view, to meet the standard of care, the appellee was required to personally review Patient's A's medical records, personally perform a physical examination and assess Patient A's laboratory work, personally obtain Patient A's informed consent, be present for induction, and check on the CRNA every 45 to 60 minutes during the surgery. Dr. Forbes concluded that the appellee failed to provide appropriate medical care because,

[T]here was no evidence that he personally participated in the pre anesthesia evaluation. There's no evidence that he

personally participated in the induction. He partially fulfilled the criteria of responding and checking on the patient at times during the case, and it's unknown whether he was present fully for emergence.

Dr. Forbes also stated that Patient A's ASA rating of 3 meant that she could "possibly have more potential for complications" and that the physicians would be "more involved and more vigilant than say an ASA 1 patient that has no medical conditions and they're going to impact their surgery."

On cross-examination, Dr. Forbes acknowledged that CRNAs can perform inductions for cataract surgery; that he is not familiar with COMAR 10.27.06 or any anesthesia groups that allow CRNAs to practice without medical direction; and that he is not familiar with anesthesia practices in parts of the state other than Salisbury. He said he believes that Union Memorial's policies on CRNAs are in violation of the standard of care. He acknowledged that he has never taught CRNAs.

### Expert Testimony for the appellee

The appellee called two expert witnesses, Timothy Gilbert, M.D., and James Pepple, M.D. Both were qualified as experts in anesthesiology.

Dr. Gilbert received his medical degree from the University of Virginia in 1987. He completed his residency in anesthesiology at George Washington University in 1992. While there, he served as Chief Resident, and then undertook a fellowship in cardiothoracic anesthesia. He also worked as a clinical instructor at George Washington University for two years and as an instructor for a CRNA program for the U.S. Navy in the District of Columbia. Dr. Gilbert worked with CRNAs while at GWU.

At the time of the hearing, he was an Associate Professor of Anesthesiology and Cardiology and the Section Chief of Cardiothoracic Anesthesiology at the University of Maryland Hospital. That hospital does not use CRNAs. Dr. Gilbert also had privileges at Maryland Shock Trauma and at Baltimore Veteran's Hospital. CRNAs are used at both of these institutions.

Dr. Gilbert is Board certified in anesthesiology and critical care medicine. He has published numerous articles.

Dr. Gilbert testified about a study he published in the *American Journal of Orthopedics* in 2000 about the use of spinal versus general anesthesia for elderly hip fracture patients. In his study, which took place in the 1990's, he evaluated 1,000 patients at eight hospitals and two academic institutions in Maryland, including the following hospitals: Northwest Medical, Franklin Square, Greater Baltimore Medical Center, St. Agnes, St. Joseph's, Sinai, Union Memorial, and the University of Maryland. Seven out of the eight hospitals use CRNAs. Although the primary focus of the study was not the level of physician supervision of CRNAs, one focus was on determining whether anesthetic care has "an impact on outcome in elderly patients in Baltimore who had hip fractures." As part of this research, Dr. Gilbert reviewed how anesthetic care is structured and delivered.

Dr. Gilbert testified that

there's a high degree of variability in the collaboration between an anesthesiologist and a [CRNA]. As evidence to what I found in the study that we performed, there are a continuum of collaborations that depend somewhat on the degree of expertise of the CRNA and the hospital policies and procedures that are in place at a given hospital. It ranges from an anesthesiologist providing care solely by themselves to the other end of the continuum where a CRNA is providing care solely by themselves with the back-up supervision or collaboration of a physician or collaboration of a physician or dentist or podiatrist.

Dr. Gilbert opined that these levels of collaboration, while varying, all are "acceptable" and meet the standard of care.

According to Dr. Gilbert, the standard of care can be met without medical direction, and "medical direction is not related inherently to the standard of care, but is more directly related to billing terminology." He noted that, in six out of the eight hospitals he examined for his study, the level of involvement of CRNAs in patient care was "relatively similar" to Union

Memorial's policy. He concluded that Union Memorial's policy complies with the standard of care, and that the appellee did not breach the standard of care in his treatment of Patient A.

Dr. Gilbert also testified that, contrary to Dr. Lyles's conclusions, Patient A's Sao2 level was not an issue of concern, due to her injury, her age, and the fact that she had been given pain medication.

On cross-examination, Dr. Gilbert clarified that, in about half of the cases in his study, anesthesia was delivered directly by anesthesiologists; in the other half, anesthesia was delivered by a CRNA in some level of collaboration with an anesthesiologist. He testified that, although non-compliance with the ASA standards for medical direction is not "de facto malpractice," the standards are "important things to look at when we're defining quality."

Dr. Gilbert further opined that, when medical direction is not used, the anesthesiologist and CRNA still should work together, because "no one wants to be left out in a room by themselves without any kind of help. But I would expect that's not so much a standard of care issue. It's just how a business is run." Dr. Gilbert agreed with the statement that, under the medical supervision model of care, "the nurse is in charge and gets consultation with the doctor as the nurse decides."

On re-direct examination, Dr. Gilbert stated that the standard of care gives CRNAs a significant role in administering anesthesia and allows them to decide when to call for help, because of their "expertise, training and knowledge."

Dr. Pepple obtained his medical degree at the University of Missouri in 1974. He completed his internship and residency in pediatrics at Johns Hopkins and then completed a residency in anesthesiology at the University of Pennsylvania. From 1983 to 1995, he worked as a staff anesthesiologist at Greater Baltimore Medical Center, where CRNAs are used. He also held the position of Assistant Professor of Anesthesiology and

Critical Care Medicine at The Johns Hopkins Hospital from 1983 to 1996.

Dr. Pepple has been Board-certified in anesthesiology since 1983. At the time of the hearing, he was Chairman of Anesthesia for the Upper Chesapeake Health System—which includes Harford Memorial Hospital, Upper Chesapeake Medical Center, and Harford Surgery Pavilion—and was the Anesthesia Director for the Towson Surgical Center. He has worked with CRNAs at Hopkins, the Greater Baltimore Medical Center, Harford Memorial Hospital, Towson Surgical Center, and Upper Chesapeake Health System. He also has authored numerous publications.

Dr. Pepple testified that, in Maryland, an anesthesiologist need not practice medical direction to satisfy the standard of care. Rather, medical direction is a term that "grew out of compliance issues that HCFA was having with ... physicians billing lots and lots and not being clear how many people were involved in care." He stated that the ASA pronouncements are "not observed," and represent a political, "ideal position."

Dr. Pepple testified that several hospitals in Maryland follow the Union Memorial model of collaboration, including Franklin Square, Carroll County, and Harford Memorial. He opined that Union Memorial's policies exceed the standard of care. Dr. Pepple stated that, when CRNAs practice "unmedically directed," that is a personnel decision made to avoid any problems with HCFA compliance. He added,

[I]t's a manpower issue. If you have so many people that have to be on call so much of a period of time, if it becomes too burdensome, you won't have any staff at all. So it's practical solution.

CRNAs are "expected to do all of the care themselves ... to do everything from A to Z themselves."

Dr. Pepple characterized the rules on collaboration between anesthesiologists and CRNAs as "very loose." He opined that, in this case, there was nothing about the cardiac status or any of the laboratory results for Patient A that altered the standard of care for the provision of anesthesia services to

her. He explained that an SaO2 level of 92 for an elderly person is within the normal range. He concluded that the appellee did not violate the standard of care in any way in providing anesthesia services to Patient A.

Dr. Pepple qualified his opinion about the standard of care by saying that, when he testified that a CRNA could perform anesthesia care "A to Z," he was not "endorsing any of this stuff." He was "just reporting as to what is occurring in Maryland, which would be the standard of care." His personal practice in administering anesthesia differs from the standard of care. His opinions about the standard of care are based on the COMAR regulations and on "what has been occurring in the state and country." He noted that, to the best of his knowledge, no Maryland hospital permits CRNAs to give anesthesia in open heart surgery.

Dr. Pepple also stated that, despite Patient A's ASA rating of 3, the standard of care had been met, given that Patient A was "awake and talking and doing everything normally" and CRNA Davis had 30 years of experience.

The appellee also called Charles F. Hobelman, Jr., M.D., Chairman of the Department of Anesthesiology at Union Memorial. He testified that Union Memorial does not use medical direction, but rather a "looser form of direction," and that its model of collaboration is similar to that used at Franklin Square. He described how the anesthesia department at Union Memorial is staffed in the evenings. He testified that the handling of Patient A's case did not differ from the standard operating procedure under similar circumstances at Union Memorial.

On cross-examination, Dr. Hobelman stated that, at Union Memorial, a CRNA may request "more specific management by an anesthesiologist." Otherwise, the CRNA handles the anesthetic responsibilities without assistance.

Finally, the appellee testified on his own behalf about the events surrounding Patient A's surgery and the level of supervision of CRNAs at Union Memorial. He said that he had worked with CRNAs at Union Memorial and had learned

about the standard of care from his work there. He opined that Union Memorial's policies exceed the standard of care because they require some consultation between the CRNA and the anesthesiologist, and there must always be an anesthesiologist present on site for consultation. Like Drs. Gilbert and Pepple, he characterized medical direction as a billing concept; stated that the ASA position statement does not establish the standard of care; and agreed that the issue of collaboration between anesthesiologists and CRNAs is a "hot and debated topic."

In summarizing his version of the events surrounding Patient A's surgery, the appellee testified that an SaO2 level of 92.5 is not unusual for an elderly patient and that there were no special risks of Patient A's surgery that required a physician to perform the preanesthetic evaluation. Had he performed the evaluation, it would have been no different than the one Davis performed. Given that Patient A "had relatively few medical conditions aside from the acute process that needed to be treated that night," his one-minute discussion with CRNA Davis about Patient A's anesthesia plan was appropriate. In ten years of collaboration, Davis always had provided the appellee with all relevant information about a patient for anesthesia evaluation.

After counsel gave closing arguments, the ALJ stated that she would issue her proposed decision within 90 days.

### The ALJ's Decision

On August 14, 2001, the ALJ issued a written proposed decision, recommending that the charges against the appellee be dismissed.

The ALJ first defined the applicable terms, including CRNA, collaboration, the various stages of the anesthesia process, and "physically available." She reviewed the relevant ASA documents and the Union Memorial policies. She then summarized Patient A's medical condition and the events of October 13, 1998.

The ALJ set forth two questions she considered to be central to the case: 1) whether the model of collaboration used by the appellee itself constituted a *per se* violation of the standard of care; and 2) assuming, *arguendo*, that the answer to that question was "no," did the appellee breach the standard of care by delegating duties in Patient A's case to Davis?

The ALJ observed that the Board's experts had testified that the medical direction model of collaboration is the minimum standard for providing quality medical care and that the standard of care for anesthesiologists requires that they follow that model. She further observed, however, that the appellee's experts were "even more impressive," and that they had testified that the method of collaboration used by the medical community is consistent with the Union Memorial Hospital mode. She found the testimony of the appellee's expert witnesses, that medical direction is not the only acceptable collaboration model, to be "entirely credible." She further found that testimony of the Board's experts was "not persuasive."

The ALJ noted that, although Dr. Lyles had referred to the ASA position statement in asserting that medical direction is the only collaboration model that meets the standard of care, he later conceded that the document was non-binding. Further, although Dr. Lyles testified that he had reached his conclusion about the standard of care independent of the ASA documents, this testimony, in the ALJ's view, was not credible. She pointed out that Dr. Lyles made several concessions on cross-examination about HCFA, the Nursing Board's opinions, and his article in the MSA May 2001 newsletter, which "belie[d] not only the credibility of the stated basis for his conclusion, but also the persuasiveness of his overall opinion."

The ALJ also found both Dr. Lyles and Dr. Forbes to be lacking in experience with CRNAs. She noted that Dr. Lyles's experience was limited to hospitals that use only the medical direction model of collaboration or do not employ CRNAs at all; and that, at the time of the hearing, he had not held admitting privileges at any Maryland hospital for about

18 months. Further, the ALJ found that Dr. Lyles was a biased witness, as he "is clearly on one side of [the CRNA collaboration] debate." The ALJ observed that Dr. Forbes's experience was limited to his practice in Salisbury and that he had not published any papers or done any research on varying models of collaboration. She stated:

[W]hile I am convinced that Dr. Forbes believes that medical direction is the minimal standard, I do not believe his conclusion is based on a full understanding of the range of practices utilized by reasonably competent practitioners in anesthesiology in the same or similar circumstances within the Maryland medical community.

In contrast, the ALJ found that the "breadth of experience of the [appellee's] witnesses demonstrated a fuller understanding of the practices of the Maryland medical community." She described Dr. Gilbert as "extremely impressive" and found that he provided the "most objective and compelling evidence" about the standard of care. She cited with approval his study in the *American Journal of Orthopedics* about elderly hip fracture patients. She noted that Dr. Gilbert had "credibly testified" that there is a continuum of practices of physical availability and that medical direction is a billing practice, not a minimum standard of care. She then summarized Dr. Pepple's testimony and Dr. Hobelman's testimony. Writing rhetorically, the ALJ asked, if medical direction is the only collaboration model that satisfies the standard of care, why would legislation such as House Bill 986 be sought to ensure that the anesthesiologist be on site? She concluded by stating:

[The appellee] presented compelling, consistent expert testimony that [the appellee] used the same degree of care and skill in selecting the "medical supervision" model of collaboration that "reasonably competent anesthesiologists" in the same or similar circumstances would use. I agree with [the appellee] that it is incorrect to conclude that his failure to adhere to the medical direction method of collaboration with CRNA Davis, in and of itself, constituted a breach of the standard of care. Like [the appellee], I agree that the

evidence fails to establish that "medical direction" is the only acceptable method of collaboration. To hold otherwise would be to conclude that all the anesthesiologists, at numerous hospitals, including Union Memorial, are daily in violation of the standard of care when they practice in conformity with their peers.

The ALJ then turned to the question of whether the appellee's collaboration with Davis, given the facts of this case, breached the standard of care. She observed that this is a factual question, because "the only real guidance about the standard of care is that the collaborating physician must be physically available to assist the CRNA during anesthesia services."

The ALJ concluded that none of the charges brought by the Board established a breach of the standard of care by clear and convincing evidence. Charge 1, that the appellee was not present during extubation and emergence, was factually unsupported by the evidence. She found no merit to the charges that the appellee was not physically available, because he never left the operating suite while Patient A was in surgery, there was a second CRNA who could have relieved him, and he could have arrived at Patient A's operating room within minutes to assist Davis, if necessary.

The ALJ then found that the appellee's delegation of responsibility to Davis met the standard of care. She noted Davis's extensive experience and the appellee's testimony that Davis had never given him reason to question [Davis's] judgment. She observed that there was no evidence presented that the appellee's confidence in Davis was misplaced.

Turning to the Board's argument that, had the appellee performed the preanesthesia assessment, he might have ordered additional laboratory reports, delayed the surgery, or altered the plan, the ALJ found that "no testimony was presented that would suggest that the ultimate anesthesia plan was incorrect" and, in fact, Dr. Forbes had opined that the overall anesthetic care met the standard of care. Further,

both Dr. Gilbert and Dr. Pepple had testified that Patient A's SaO2 level of 92.5 was not cause for concern.

The ALJ further found that, although the Board suggested that Patient A's hypotension would have been treated differently had the appellee collaborated with Davis in a manner consistent with medical direction, all witnesses except Dr. Lyles had concluded that Davis's treatment was appropriate.

The ALJ summarized her findings as follows:

> In light of the credible expert testimony, I cannot conclude that the Board has established by clear and convincing evidence that [the appellee's] care of Patient A did not satisfy the standard of care. The Nursing Board regulations [COMAR 10.27.06] approved by the [Board], essentially require one thing only for collaboration—that the physician be physically available. Union Memorial's policy, adhered to by [the appellee] in his [October] 13, 1998 care of the Patient, more than meets the minimal requirements of physical availability as practiced by competent Maryland practitioners. As noted previously, the standard of care in Maryland does not require any specific actions on the part of the collaborating physician prior, during or after surgery beyond this "physical availability." Thus, while [the appellee] did not comply with the requirements of the medical direction model of collaboration, that is not the standard.
>
> I find, therefore, that [the appellee] was "physically available" to CRNA Davis and that his collaboration with CRNA Davis in the treatment of Patient A was within the standard of care practiced in the medical community.

The Board filed exceptions to the ALJ's decision. An exceptions hearing was held before the Board on December 19, 2001.

### The Board's Decision

The Board rejected the ALJ's proposed decision in a written opinion dated June 3, 2002. The Board concluded that the appellee had failed to meet the appropriate standards for the provision of quality medical care in Maryland, in violation of

HO section 14–404(a)(22). The Board reprimanded the appellee, and stated that it would conduct a chart review of his cases after the date of its decision, "in order to determine if the standard of quality medical care is being met with regard to interaction with patients and supervision of CRNAs during anesthetic procedures."

In reaching its decision, the Board first summarized the facts. It stated that it did not disagree with "many" of the ALJ's factual findings.

The Board noted that the only issue that was sharply contested was "the degree of supervision that an anesthesiologist who has accepted responsibility for a patient must provide to a CRNA who administers anesthesia in the circumstances of this case." The Board stated that the standard for the provision of quality medical care is determined by appropriate peer review, the opinion of experts in the field, and the Board's own medical expertise. The Board stated that it was within its province to weigh the opinions given by the expert witnesses in a contested case hearing "depending on the experts' training, experience and knowledge, as well as the bases for their opinions."

The Board summarized each expert witness's credentials, background, and testimony. The Board did not address the ALJ's credibility and bias determinations about the experts.

The Board next observed that the ALJ used the terms "medical direction" and "medical supervision" as "models of supervision" and determined that the "medical supervision model" was "widely used and thus established the standard of care." The Board disagreed with the ALJ's proposed formulation of the standard of care, stating that the ALJ had "created a false dichotomy between the 'medical direction model' on one hand and the HCFA term 'medical supervision' on the other." The Board found that these were "insurance terms" and were "only marginally relevant to the ultimate issue here."

In the Board's view, the ALJ incorrectly divided all possible types of supervision of CRNAS into two models, and "any

supervision which did not conform to the ASA statement was called 'medical supervision' and was deemed to follow that 'model.' " The Board disagreed with this means of analysis, noting that the dichotomy exists *"for HCFA reimbursement reasons only."* (Emphasis in original.) The Board continued:

Anesthesiologists can and obviously do provide at times more supervision than that provided by [the appellee] but still fail to meet every criteria set out in the ASA statement. An example is Dr. Forbes'[s] use of CRNAs in cataract surgery. Anesthesiologists also sometimes bill for "medical supervision" while providing more supervision than that provided by [the appellee] in this case. An example is Dr. Pepple, who does not use and does not endorse the lowest level of supervision billable as "medical supervision," but who bills HCFA only for "medical supervision." The ALJ's proposed findings that a number of hospitals use the "medical supervision model" are thus off the mark, since the issue in this case is not the choice between two "models" set up by HCFA for reimbursement purposes, but a determination of what the standard of quality medical care requires.

(Citations omitted.)

The Board observed that both Dr. Lyles and Dr. Forbes pointed out that circumstances could justify variations from the ASA statement. It reiterated that the issue was not a choice between two models of supervision but, rather, "what does the standard of quality medical care require in this case[?]"

The Board also criticized the ALJ for relying upon the Board of Nursing regulations, in COMAR 10.27.06, because they set the minimum standards for CRNAs, not anesthesiologists.

The Board found the appellee's experts' testimony on practices elsewhere "fuzzy" and "vague." It observed that Dr. Gilbert had not actually assessed the degree of supervision at the hospitals in his study and that Dr. Pepple had named hospitals that he said used "similar activities," but had not provided any details or the basis for his conclusion. Further,

the Board found that Dr. Gilbert generally does not practice with CRNAs and Dr. Pepple refused to "endors[e] any of this stuff."

In addition, the Board found that "the testimony of Drs. Lyles and Forbes was based more on medical considerations than that of Drs. Gilbert and Pepple." The Board stated that Dr. Lyles and Dr. Forbes "testified convincingly that they learned in their training that a higher degree of supervision was necessary—and that the consensus of the nationwide community of anesthesiologists is that more supervision is required than that provided by [the appellee] in this case."

In summarizing its conclusions, the Board stated that the ALJ's focus on the Board of Nursing's regulations and on the "false dichotomy between the 'models' of 'medical direction' and 'medical supervision'" was unwarranted. Further, the ALJ's finding that there was an additional CRNA available to relieve the appellee was "an oversimplified view of the evidence." The Board rejected the ALJ's finding that Union Memorial's model of supervision of CRNAs is consistent with the models used at other hospitals, stating that it was not supported by the evidence and was misleading. The Board concluded:

> Altogether, the ALJ's proposed decision was based on an oversimplified and mechanical view of the [Board's] evidence which did not give adequate consideration to the actual medical factors in this case. The proposed decision did not weigh sufficiently the seriousness of the patient's condition or the responsibility of [the appellee] for her medical care.

The Board observed that there was "no certainty" in this case that Patient A's complications would not have arisen if the appellee had more closely supervised Davis; the issue of causation was not before it, however.

Noting that it had considered the expert testimony about the standard of care in the light of its own expertise, the Board determined that the appellee had breached the standard of care by:

(1) failing either to physically examine the patient or to preview personally the chart or any laboratory data;

(2) failing to interact personally with the patient and explain the anesthesia opinions and obtain informed consent;

(3) failing to be present during induction and intubation[;] and

(4) failing to check in on the progress of the anesthesia within one hour of induction.

The Board further stated:

The standard of quality medical care in this state required that [the appellee], as the anesthesiologist accepting responsibility for this patient, fulfill each of these four functions.

The Board found that the appellee had not violated the standard of care with respect to his physical availability on the night of the surgery.

### Action for Judicial Review

On June 28, 2002, the appellee filed a petition for judicial review of the Board's decision reprimanding him. On May 5, 2003, a hearing was held in the Circuit Court for Baltimore County.

On August 25, 2004, the circuit court issued a very thorough opinion reversing the Board's decision.

The Board noted the instant appeal on September 9, 2004.

### DISCUSSION

The question for review in this case is whether the Board's final decision, that the appellee failed to render appropriate medical care to Patient A in the four ways enumerated above, is supported by substantial evidence in the agency record and is not premised on an erroneous conclusion of law. *Maryland Aviation Admin. v. Noland*, 386 Md. 556, 571, 873 A.2d 1145 (2005) (citing *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67, 729 A.2d 376 (1999)). The questions framed by the parties in their briefs are arguments in support of their

opposing sides of this issue. Therefore, we shall address them in one discussion.

### Review of Adjudicatory Agency Decision

■ In this Court, in an appeal from the final decision of an administrative agency, we review the agency's decision, not the decision of the circuit court. *See McKay v. Dep't of Pub. Safety,* 150 Md.App. 182, 193, 819 A.2d 1088 (2003); *Anne Arundel County v. Muir,* 149 Md.App. 617, 625, 817 A.2d 938 (2003).

■ In *Finucan v. Maryland Board of Physician Quality Assurance,* 380 Md. 577, 590–91, 846 A.2d 377 (2004), the Court of Appeals explained the narrow standard of review that governs an administrative agency's adjudicatory decision:

> It is well settled that the State Judiciary's role in reviewing an administrative agency's adjudicatory decision is limited, *United Parcel Service, Inc. v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226, 230 (1994); it "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel,* 336 Md. at 577, 650 A.2d at 230.... We, therefore, ordinarily give considerable weight to the administrative agency's interpretation and application of the statute that the agency administers. Furthermore, the expertise of the agency in its own field of endeavor is entitled to judicial respect. *Fogle v. H & G Restaurant, Inc.,* 337 Md. 441, 455, 654 A.2d 449, 456 (1995); *Christ v. Dep't of Natural Res.,* 335 Md. 427, 445, 644 A.2d 34, 42 (1994) (legislative delegations of authority to administrative agencies will often include the authority to make "significant discretionary policy determinations"); *Bd. of Ed. For Dorchester Co. v. Hubbard,* 305 Md. 774, 792, 506 A.2d 625, 634 (1986) ("application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the" legal issues).

(Some citations omitted.) *See also Noland, supra,* 386 Md. at 570–73, 873 A.2d 1145; *Banks, supra,* 354 Md. at 67–69, 729 A.2d 376.

 When a reviewing court applies the substantial evidence test, it decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Banks, supra,* 354 Md. at 68, 729 A.2d 376 (internal quotations omitted). "A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record." *Id.* The agency's decision must be reviewed in the light most favorable to it; because it is the agency's province to resolve conflicting evidence and draw inferences from that evidence, its decision carries a presumption of correctness and validity. *Id.; Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834–35, 490 A.2d 1296 (1985). We give "considerable weight" to an agency's "interpretations and applications of statutory or regulatory provisions" that are administered by the agency. *Noland, supra,* 386 Md. at 573 n. 3, 873 A.2d 1145; *Oltman v. State Bd. of Physicians,* 162 Md.App. 457, 482, 875 A.2d 200 (2005).

In *Anderson v. Department of Public Safety and Correctional Services,* 330 Md. 187, 215, 623 A.2d 198 (1993), the Court of Appeals stated, "The creation of an ALJ as an impartial hearing officer in administrative proceedings introduced another factor to be considered in our standard for judicial review" of an agency's final decision. The Court observed that the ALJ's findings are part of the agency record; and that evidence supporting the agency's decision " 'may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the (agency's) than when he has reached the same conclusion.' " *Id.* at 216, 623 A.2d 198 (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

The Court held that, when witness credibility is significant in a case that has been heard by an ALJ, the agency's decision-maker should give deference to the ALJ's demeanor-

based credibility findings and should reject those findings only if it gives strong reasons for doing so. It stated, " 'The [ALJ's] findings as to credibility have almost conclusive force and the importance of credibility evidence to the final decision will affect the weight given the [ALJ's] findings.'" *Id.* at 217, 623 A.2d 198 (quoting 1 Charles H. Koch, *Administrative Law and Practice,* at 522 (1985)). Therefore, the ALJ " 'has the power to reject credibility assessments only if it gives strong reasons for doing so.'" *Id.* (quoting Koch, *supra,* at 522).

The Court in *Anderson supra,* determined that the credibility *vel non* of the fact witnesses in the case "was of utmost importance to the circumstances," "played a dominant role," and was "pivotal." 330 Md. at 218, 623 A.2d 198. It concluded that the agency's final decision-maker failed to give any deference to the ALJ's credibility assessments of those witnesses, and gave no strong reasons for rejecting the ALJ's credibility assessments. On that basis, the Court determined that it could not be said that the agency's decision was supported by substantial evidence. The Court vacated the agency's final decision and instructed that the matter be remanded, for the final decision-maker to "reconsider her order in the light of what we have found to be the interrelation between her function and the function of the ALJ." *Id.* at 219, 623 A.2d 198.

In *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 641 A.2d 899 (1994), this Court, relying upon *Anderson,* explained that, in assessing the rationality and evidentiary basis for an agency's final decision, we may take into account that on a cold record the agency made a decision contrary to the one the ALJ proposed on a live record, *i.e.,* upon first-hand observation of witnesses. We went on to hold:

[W]hen an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record. *Moreover, where credibility is pivotal to the agency's final order, [the]*

*ALJ's findings based on the demeanor of witnesses are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so. If, however, after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion.* This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court. 100 Md.App. at 302–03, 641 A.2d 899 (emphasis added).

In *State Commission on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 693, 818 A.2d 259 (2003), we stated that, under the holding in *Shrieves, supra,* the agency, which ordinarily owes no deference to an ALJ's findings, "should give substantial deference to the ALJ's credibility determinations to the extent they are critical to the outcome of the case *and* they are demeanor-based, that is, they are the product of observing the behavior of the witnesses and not of drawing inferences from and weighing non-testimonial evidence." *See also Berkshire Life Ins. v. Maryland Ins. Admin.,* 142 Md.App. 628, 648, 791 A.2d 942 (2002); *Gabaldoni v. Bd. of Physician Quality Assurance,* 141 Md.App. 259, 261–62, 785 A.2d 771 (2001).

The opinion most pertinent to this case was issued last year the Court of Appeals. In *Consumer Protection Division v. Morgan,* 387 Md. 125, 874 A.2d 919 (2005), two appraisers were charged by the Consumer Protection Division ("Division") with violating the Maryland Consumer Protection Act by making false and misleading statements in appraisals of properties that were sold to unsuspecting buyers at grossly inflated prices, as part of a "flipping" scheme.

A contested case hearing was held before an ALJ. The evidence presented included the testimony of two real estate

appraisal experts, one called by each side. The Division's expert prepared reports criticizing the appraisals performed by the defendants based on consideration of data available to the appraisers when the appraisals were done. He testified about his reports before the ALJ. The defendants' expert also testified and disputed some of the opposing expert's testimony about the appraising process and the resources available to the defendants. The defendants testified and denied any wrongdoing. One of them disputed some of the appraising criteria about which the Division's expert testified, and introduced into evidence an appraisal of one of the properties at issue that was performed by a respected appraiser, to show that acceptable appraisals can vary.

The ALJ made a determination wholly in favor of one defendant and partially in favor of the other. The Division's final decision-maker reviewed the case on the record and rejected most of the ALJ's findings, ruling against the defendants on all issues. In their action for judicial review and subsequently before the Court of Appeals, the defendants argued that the case was not a proper one for the agency's final decision-maker to decide on a cold record, without giving deference to the ALJ's credibility findings and stating strong reasons refuting them.

The Court of Appeals started its discussion of the issue by explaining that, in general, an agency's final decision can be made based on a record review of testimony and other evidence adduced at a contested case hearing. The exception to the rule, as stated in *Anderson, supra*, exists when the ALJ's findings rest on demeanor-based credibility assessments of witnesses. In that situation, the final decision-maker must give deference to those findings and can reject them only when strong reasons for doing so are stated.

Turning to the evidence introduced at the contested case hearing, the Court stated:

A conclusion based on [that] evidence necessarily would focus on appraisal standards, the accuracy of [the defendants'] appraisals, and the information available to the

appraisers at the time of the appraisal. As such, the determination would focus on the experts' testimony, [the Division's expert's] reports, [the respective appraiser's] reports, [one of the defendant's] testimony about his understanding of appraisal procedures, and, most importantly, [the defendants'] actual appraisal reports.

*Morgan, supra,* 387 Md. at 202, 874 A.2d 919.

The Court concluded that an assessment of the demeanor of the expert witnesses was "of minimal importance in this technical case." *Id.* More specifically, the Court held that the defendants had not shown "that the resolution of the issues [in the case] turned on a demeanor-based credibility assessment of the experts." *Id.* at 203, 874 A.2d 919. The Court quoted the following passage from *New England Coalition on Nuclear Pollution v. United States Nuclear Regulatory Commission,* 582 F.2d 87, 100 (1st Cir.1978):

> Though credibility of the conflicting experts must play a central role in the [agency] decision, that credibility is a function of logical analysis, credentials, data base, and other factors readily discernible to one who reads the record. [The intervenor] has not demonstrated that this is an issue that turns on conflicting eyewitness reports or evaluations of the witnesses' demeanor or conduct.

387 Md. at 202, 874 A.2d 919. The Court also quoted the observation of the United States Court of Appeals for the D.C. Circuit in *Millar v. FCC,* 707 F.2d 1530, 1539 (D.C.Cir.1983), that expert testimony is a category of evidence in which "credibility may play a role, but demeanor may not."

### Parties' Contentions

The Board contends that the circuit court's decision must be reversed because there was substantial evidence in the agency record to support the finding, by clear and convincing evidence, that in his treatment of Patient A the appellee failed to "meet appropriate standards as determined by appropriate peer review for the delivery of quality [ ] medical care . . . in a[ ] . . . hospital." HO section 14–404(a)(22). It argues that

the ALJ's findings were not the product of demeanor-based credibility assessments and, therefore, the Board did not owe them deference and had no obligation to state strong reasons for rejecting them; that the Board considered the ALJ's findings and adequately explained its reasons for rejecting them; that there was substantial evidence to support the Board's decision; and that it was not an error of law for the Board to reject the ALJ's findings about which of the expert witnesses accurately testified about the appropriate standard of care.

The appellee responds that the ALJ's findings about the standard of care were a result of her demeanor-based credibility assessments of the expert witnesses who testified about what the standard of care is; that the Board erred by failing to give substantial deference to those findings and by not stating strong reasons for rejecting those findings; that even if the ALJ's findings did not rest on demeanor-based credibility assessments, the Board's decision is not supported by substantial evidence in the record; and that the Board committed an error of law by imposing a standard of care on the appellee that differs from what a reasonably prudent physician would be required to do under the same or similar circumstances.

### *Analysis*

#### (i)

The threshold question here is whether the resolution of the disputed issue in the contested case hearing turned on demeanor-based credibility assessments of any of the testifying expert witnesses.

As we have explained, for all practical purposes, the basic facts surrounding the appellee's involvement in Patient A's care on October 13, 1998, were undisputed. Having charged the appellee with violating HO section 14–404(a)(22), the Board bore the burden of proving, by clear and convincing evidence, that the appellee's actions or omissions on that date violated "appropriate standards as determined by appropriate

peer review for the delivery of quality medical [ ] care ... in a[ ] ... hospital." Essential to that charge was proof, also by clear and convincing evidence, of what exactly were the "appropriate standards as determined by peer review for the delivery of quality medical care" by the appellee to Patient A. The only disputed issue at the hearing was what were "appropriate standards" that governed the appellee's treatment of Patient A.

The evidence about "appropriate standards" was presented in a classic "battle of the experts." Two experts for the Board (Drs. Lyles and Forbes) testified that the appellee did not adhere to appropriate standards, because he did not personally examine the patient or review her chart and laboratory data; did not personally obtain informed consent from her; was not present during induction and intubation; and did not check on the patient's status within an hour of induction. Two experts for the appellee (Drs. Gilbert and Pepple) testified that it was within appropriate standards of care for the appellee to delegate those functions to Davis, an experienced and reliable CRNA.

The ALJ found the testimony of the Board's experts "not persuasive" and the testimony of the appellee's experts "persuasive," "compelling," and "consistent." Her stated reasons for assessing the Board's experts as she did were:

- Dr. Lyles relied upon the ASA guidelines as establishing the standard of care, but then conceded that they merely were a position statement, not a standard or guideline.

- Dr. Lyles's testimony that his opinion about the standard of care was based on consensus among anesthesiologists, and not on the ASA documents, was not credible, because he testified inconsistently on that point on cross-examination; he conceded that Medicare billing for anesthesia services envisions that anesthesiologists may delegate the preoperative and intraoperative functions to CRNAs, or may not; the State regulations governing the Nursing Board contemplate broad delegation of functions to CRNAs, requiring only "physical availability" by anesthe-

siologists; and in a column he wrote for a newsletter of the Maryland Society of Anesthesiologists, he stated that there is a "high degree of variability" in individual supervision and collaboration agreements.

- Dr. Lyles has limited anesthesia experience in Maryland.
- Dr. Lyles has engaged in "partisan participation in the ongoing debate in the medical community concerning" whether the standard of care requires direct participation by anesthesiologists, rather than delegation to CRNAs, and he is "clearly on one side of this debate," testifying before a legislative subcommittee in favor of a bill that would have mandated direct supervision.
- The existence of a bill that would mandate, legislatively, the standard of care that Dr. Lyles testified already prevails undermines his testimony that that is the prevailing standard of care; otherwise, there would have been no need for the legislation.
- Dr. Forbes has practiced anesthesiology only in Salisbury, has not published any papers, and does not have a full understanding of the range of practices used by reasonably competent anesthesiologists in the same or similar circumstances in Maryland.

The ALJ gave the following reasons for crediting the testimony of the appellee's expert witnesses:

- The appellee's experts were "more impressive" in their knowledge of the methods of collaboration between anesthesiologists and CRNAs in Maryland. They both had a wider breadth of experience that gave them a "fuller understanding of the practices in the Maryland community"; had published relevant papers; and held or had held academic posts.
- A study Dr. Gilbert performed about elderly patients with hip fractures showed that, of the eight Maryland hospitals in which care was rendered, seven had anesthesia delivery systems in which the anesthesiologists and CRNAs collaborated in rendering care. Six of those hospitals employed collaboration models in which the preoperative and in-

traoperative care were delegated to the CRNA, just as in this case.

- Based on his knowledge of the practices at many hospitals in Maryland, Dr. Gilbert was able to say that there is a continuum of models of collaboration between anesthesiologists and CRNAs, all of which are within the standard of care, and which include delegation of preoperative and operative functions to experienced CRNAs.

- Dr. Gilbert explained that the "medical direction" and "medical supervision" distinctions are a matter of billing preferences and terminology, and do not establish that one practice is acceptable and the other is not.

- Dr. Pepple likewise was familiar with the collaboration models used at many Maryland hospitals and outpatient centers and was able to state, based on his experience, that the collaboration model at Union Memorial, which the appellee followed, is the same as that adopted at three other Maryland hospitals, and conforms to the standard of care.

The ALJ stated that the testimony of the appellee's experts was "entirely credible."

A witness's demeanor is his outward behavior and appearance while testifying before the fact finder: his facial expressions, tone of voice, gestures, posture, eye-contact with the questioner and others in the courtroom, and readiness or hesitation to answer the questions posed. Demeanor-based credibility assessments are made based on how the witness acts on the witness stand, and as such cannot be made without seeing, or at the very least hearing, the witness testify. A witness's demeanor cannot be assessed merely by reading a transcript of his testimony, which is why, when credibility assessments have been made by an ALJ based on demeanor, an agency's final decision-maker must give them deference and state strong reasons for rejecting them.

Here, the ALJ stated several times in her proposed decision that the appellee's expert witnesses were credible, and that they were more credible than the Board's expert witnesses.

The reasons she gave to support her credibility findings did not involve assessments of the witnesses based on their demeanor, however. Clearly, the ALJ found the appellee's experts to be more experienced, more proficient, more knowledgeable, and more objective than the Board's witnesses, and determined on those bases that their opinions were sound and correct, and were "persuasive" and "credible." She said nothing to indicate that the outward appearances of the expert witnesses as they testified played a part in her credibility evaluations of their testimony. By her own account of her evaluation of the evidence, the ALJ did not place any importance upon the demeanor of the expert witnesses in deciding which of them was more credible in their testimony.

■ To be sure, the subject matter of the expert witness testimony in this case was not as technical and mechanical as that in *Morgan, supra,* 387 Md. 125, 874 A.2d 919. And an expert witness's power of persuasion cannot be measured solely on the basis of objective criteria, such as the logic and reasonableness of his opinion, without regard to his behavior on the witness stand. The opinion of the foremost authority in a field who speaks and moves as if he lacks confidence in what he is saying is likely to be rejected by the fact-finder(s) observing him, while a "junk science" expert may be credited if he presents himself with assurance. Still, expert witnesses usually are not testifying about first-level facts that are susceptible of a "true or false" determination by the fact-finder (for example, whether the appellee indeed was in the operating room during extubation, as opposed to whether prevailing standards required him to be there). Demeanor most often is a factor in deciding the credibility of a fact witness who is testifying about a fact that may be true or false, not of an expert who is offering his opinion based on assumed facts.

■ Witness bias is a measure of credibility, but also is not demeanor-based. Bias is a matter of interest of the witness in the outcome of the case, which would lead the witness to color his testimony and which suggests partiality and a motive to lie. *See Maslin v. State,* 124 Md.App. 535, 723 A.2d 490 (1999) (defense was entitled to develop issue of bias

of the victim in a criminal case by showing that the victim had brought a civil action against the defendant for damages for the same conduct). Wide latitude must be allowed in permitting cross-examination of a witness to show bias. *Wrobleski v. de Lara*, 353 Md. 509, 517, 727 A.2d 930 (1999); *Thomas v. State*, 143 Md.App. 97, 110, 792 A.2d 368 (2002).

 Bias can be shown on a cold record, however; a witness does not have to be observed for the fact-finder to determine that he has an interest in the outcome of the case that has led him, consciously or not, to shade his testimony. In this case, the appellee's counsel effectively cross-examined Dr. Lyles about his activities in support of legislation that would have mandated that anesthesiologists personally perform certain tasks of patient care—instead of delegating them to CRNAs—along the lines of the medical direction model of collaboration, and about his work in conjunction with the MSA and Med Chi to that end. The ALJ was impressed by this evidence, and it is part of the reason she gave little weight to Dr. Lyles's opinions. The Board had the prerogative to re-weigh evidence that was not demeanor-based, however, and it was not impressed with the bias evidence against Dr. Lyles, and weighed his opinions heavily. So long as the statutes governing physician discipline in Maryland do not require that the Board accept the findings of the ALJ rendered after a contested case hearing, the Board may make its own decisions about bias, interest, credentials of expert witnesses, the logic and persuasiveness of their testimony, and the weight to be given their opinions.

Accordingly, the Board did not owe deference to the credibility assessments made by the ALJ, and was not required to state strong reasons for rejecting those assessments. We cannot say that the failure to do so was error, or that it alone rendered the Board's decision unsupported by substantial evidence.

### (ii)

As mentioned previously, the appellee argues that, even if the ALJ's findings did not rest on demeanor-based credibility

evaluations of the expert witnesses, the record nevertheless does not contain substantial evidence to support the Board's decision. He maintains that the testimony of both the Board's expert witnesses was deficient, and therefore could not support a finding that the appellee breached appropriate standards of care in his treatment of Patient A.

■ The appellee complains that Dr. Forbes did not have an adequate foundation for his opinion about the appropriate standards of care. Specifically, Dr. Forbes testified that his knowledge of the applicable standards came solely from his years of practice in Salisbury, and that he was unfamiliar with the collaboration practices of anesthesiologists elsewhere in Maryland. The appellee argues that an expert witness's opinion is only as good as the foundation on which it rests, and Dr. Forbes's opinion was not based on an adequate foundation. *See Days Cove Reclamation Co. v. Queen Anne's County,* 146 Md.App. 469, 807 A.2d 156 (2002).

We agree with the appellee that Dr. Forbes's opinion was legally insufficient to provide substantial evidence that the appellee breached appropriate standards of care in his treatment of Patient A. Dr. Forbes admitted on the stand that he did not have any knowledge of standards of care other than what he had seen in Salisbury. Under HO section 14–404(22), the Board may take disciplinary action against a physician who "[f]ails to meet appropriate standards as determined by appropriate peer review for the delivery of quality medical and surgical care performed in an outpatient surgical facility, office, hospital, or any other location in this State." This language makes plain that a physician's conduct is to be measured against appropriate standards of care followed in the State of Maryland. Dr. Forbes was not familiar with appropriate standards of care for anesthesiologists working with CRNAs in Maryland. He was familiar only with the standards that are followed in one small area of the state.

■ The appellee complains that Dr. Lyles's testimony was insufficient to support the Board's decision because he also was unfamiliar with state-wide standards of care for

anesthesiologists collaborating with CRNAs, and he was a biased witness with an interest in the outcome of the case.

The appellee's argument that Dr. Lyles was not familiar with standards of care in Maryland is that he testified, on cross-examination, that he did not have any "personal knowledge" of whether any anesthesiologists in Maryland are collaborating with CRNAs "in a variety of ways." The context of this testimony was a line of questioning about Dr. Lyles's article in the May 2001 MSA newsletter in which he stated, "A high degree of variability exists in the individual supervision, collaboration agreements with regard to the definition of clinical responsibilities and duties." Dr. Lyles testified that, when he wrote that article, he was "presuming" that the variability existed, and that his first-hand knowledge was only of the collaboration agreements to which he had been a party.

This testimony did not show that Dr. Lyles was without sufficient familiarity with the standards of care applicable to anesthesiologists in Maryland, with regard to collaboration with CRNAs, to express an opinion on that topic. It merely showed that his statement in the newsletter was based on a presumption that there are variations in collaboration agreements in Maryland. There was other testimony by Dr. Lyles that, if credited, showed an adequate foundation for his opinions about the standard of care. For example, he testified that the ASA guidelines, standards, and position papers are formulated through the "membership on the state level," and that his opinions about the standards of care for anesthesiologists in Maryland are based on those documents. He testified that the documents set forth the consensus "of what presently exists" in the Maryland "anesthesia community."

■■■ As stated above, bias is a factor in according (or not according) weight to testimony; and because bias can be determined from the record, it was the Board's prerogative to decide whether to discount the weight it would give Dr. Lyles's testimony on account of bias. Obviously, the Board decided not to discount Dr. Lyles's testimony on that ground. We cannot substitute our judgment for that of the Board.

■ We conclude nonetheless that this case must be remanded to the Board for reconsideration. As explained above, "in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Steelworkers of America AFL–CIO Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62 (1984). *See also United Parcel Service, Inc., supra*, 336 Md. at 577, 650 A.2d 226.

■ Here, the reason stated by the agency for finding, by clear and convincing evidence, that the appellee failed to adhere to appropriate standards of care was that the testimony of Dr. Lyles *and* Dr. Forbes, and the Board's own expertise, established a standard of care that required that the appellee personally take certain steps in treating Patient A that he did not take. For the reasons we have explained, Dr. Forbes's opinions did not rest on a legally sufficient foundation, and therefore did not constitute substantial evidence to support the Board's decision. Moreover, although the expert opinion testimony of Dr. Lyles *could have* constituted substantial evidence supporting the Board's decision, in and of itself, *see Blaker v. State Bd. of Chiropractic Examiners*, 123 Md. App. 243, 259–60, 717 A.2d 964 (1998), we cannot determine on this record whether the Board *would have* reached the same result absent the testimony of Dr. Forbes. Indeed, the Board's written decision, referring to the doctors collectively, suggests to the contrary. In any event, we cannot affirm the Board's decision on the basis of the reasons it gave, because those reasons include Dr. Forbes's expert opinions.

In Maryland, the harmless error doctrine has been applied in judicial review of agency decisions. *See Dep't of Econ. & Employment Dev. v. Propper*, 108 Md.App. 595, 607–08, 673 A.2d 713 (1996) (holding that agency's subsidiary factual finding that was not supported by evidence in the record did not warrant a reversal because its presence was not material to the agency's ultimate decision); *Jacocks v. Montgomery County*, 58 Md.App. 95, 107, 472 A.2d 485 (1984) (holding that

admission by police review board of tape of interview of charged officer's supervisor was erroneous, but clearly harmless). In the case at bar, we are not dealing with a clearly erroneous factual finding or the erroneous admission of evidence. We are confronted with an ultimate finding that rested, at least in part, on invalid expert opinion testimony. We conclude that a harmless error analysis is appropriate because of the possibility that the improper basis relied upon by the Board may have tainted its entire decision and may have affected the weight that it gave the agency's evidence in a matter that required clear and convincing proof.

When an agency reaches a decision "based on several grounds and one or more is invalid, a reviewing court must appraise whether the invalid ground 'may not have infected the entire decision.'" *Club 99, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 457 A.2d 773, 775 (D.C.App. 1982) (quoting *Dietrich v. Tarleton*, 473 F.2d 177, 179 (D.C.Cir.1972)). If the agency's error in relying on the invalid ground was *de minimis*, a remand is not required. However, if there is substantial doubt that the agency would have reached the same result absent the erroneously considered evidence, the case should be remanded for the agency to decide anew. *See NLRB v. Milgo Industrial, Inc.*, 567 F.2d 540, 546 (2d Cir.1977) (*cited with approval in Propper, supra*, 108 Md.App. at 608, 673 A.2d 713). *See also Arthur v. District of Columbia Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C.App.1983) (holding that reviewing court may invoke rule of prejudicial error in reviewing administrative agency decisions and that remand is required when substantial doubt exists as to whether agency would have made the same ultimate finding with the error removed).

Given the importance of expert witness testimony to the charge in this case, the bias evidence against Dr. Lyles, and the high standard of proof, there is substantial doubt that, absent the opinion testimony of Dr. Forbes, the Board would have found that the appellee violated appropriate standards of care in his treatment of Patient A. Accordingly, we shall

remand the case to the circuit court with instructions to further remand it to the Board for reconsideration without Dr. Forbes's testimony.

### (iii)

Finally, the appellee argues that the Board committed legal error by unilaterally establishing a standard of care in Maryland that does not yet exist. He asserts that, in effect, the Board measured the appellee's conduct against a standard of care the Board members think *should* exist, not against a standard of care that *does* exist. As the appellee puts it, "[t]he Board is announcing a standard of care for the first time rather than objectively viewing the record in order to determine whether the charges are supported by clear and convincing evidence."

By crediting Dr. Lyles's opinions about the standard of care in its entirety, and discrediting the opinions of the appellee's expert witnesses, the Board reasonably could find, on the evidence before it, that the appellee violated the standard of care in his treatment of Patient A. Dr. Lyles explained that he was expressing opinions about the standard of care as it presently exists. Again, it was the Board's choice whether to credit his opinions; we cannot second-guess the Board's decision in that regard, even if we would have decided otherwise had we been the fact-finders.

The gist of this argument, however, is that in this case the disciplinary hearing process was biased against the appellee, and therefore unfair. Rather than an objective adjudicatory proceeding, it was simply a vehicle for the Board to impose on anesthesiologists a standard of care it had sought, and failed, to impose legislatively. The proceeding could be abused in that fashion because the Board is the prosecutor and the final adjudicator of the charges.

In *Morgan, supra,* 387 Md. at 193, 874 A.2d 919, the Court of Appeals addressed a similar argument. The defendant asserted that he was denied due process of law because there was "no separation of the prosecutorial and adjudicatory pro-

cess within the Division" and the "combination of prosecutorial and adjudicatory functions makes the adjudicatory process farcical, as the Division's adjudicator can overturn the ALJ's proposed decision and issue an order in accord with the Division prosecutor's charges." Relying upon *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the Court held that the combination of administrative prosecutorial and adjudicatory functions does not, in and of itself, violate due process. To prove such a violation, there must be "evidence in the record of special facts and circumstances posing an intolerably high risk of unfairness" that " 'overcome a presumption of honesty and integrity in those serving as adjudicators.' " *Id.* at 195, 874 A.2d 919 (citing *Larkin, supra*, 421 U.S. at 47, 95 S.Ct. 1456). It rejected the defendant's argument, finding that there was no such evidence in the record.

 Here, the prosecutorial and adjudicatory functions are combined; an objective ALJ presided over a contested case hearing in which the Board's primary expert witness was associated with a legislative effort to impose by statute the standard of care he was testifying already exists; the ALJ discredited that testimony; and the Board then rejected the ALJ's findings and credited its own expert witness's testimony. While troubling, we cannot say that this evidence established special circumstances showing that the decision of the Board was not made with honesty and integrity. If there is a risk of unfairness in this process, the way to eliminate it is to amend HO sections 14–405 and 14–406 to require the Board to be bound by the findings of the ALJs in contested case hearings.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REMAND TO THE BOARD OF PHYSICIANS FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE–HALF BY THE APPELLEE.**