*Prince George's County Department of Social Services v. Akeem Taharaka*, No. 786, September Term 2020, filed February 25, 2022. Opinion by Friedman, J.

**HEADNOTE:**

INFANTS — CHILD PROTECTION — AGENCIES AND PROCEEDINGS — ADMINISTRATIVE PROCEEDINGS AND REVIEW THEREOF

In evaluating the factors under CP § 11-304(e)(2) to determine whether a child's statements are sufficiently reliable to be considered credible evidence of child sexual abuse, an ALJ may not use archaic stereotypes but should instead apply the factors in a manner that is consistent with current understandings of child sexual abuse and trauma-informed credibility assessments.

Circuit Court for Prince George's County
Case No. CAL 19-30070

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 786

September Term, 2020

_____

PRINCE GEORGE'S COUNTY
DEPARTMENT OF SOCIAL SERVICES

v.

AKEEM TAHARAKA


_____

Kehoe,
Friedman,
Ripken,

JJ.

_____

Opinion by Friedman, J.

_____


Filed: February 25, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Prince George's County Department of Social Services identified Akeem Taharaka as the individual responsible for committing child sexual abuse on A.B.[1] Taharaka denied the allegation of abuse and, as is his right, requested a hearing before an Administrative Law Judge. The ALJ found that Taharaka was credible and that the statements of his accuser, A.B., were not. The ALJ also found that Taharaka was not a regular presence in A.B.'s home and, therefore, could not commit child "sexual abuse" as that term is defined by the relevant statute. We hold that the ALJ erred in reaching these decisions.

## FACTS AND BACKGROUND

Under the Family Law Article, child "sexual abuse" is defined as "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." MD. CODE, FAM. LAW ("FL") § 5-701(x)(1) (2012).[2] When a local department of social services receives a report of suspected child sexual abuse, the department must conduct an investigation. FL § 5-706(b) (2017). The purpose of the investigation is to "protect the health, safety, and welfare of the child," *id.*, which

---

[1] The initials "A.B." have been chosen at random. Neither A.B.'s given name nor her surname begins with these letters.

[2] Because the alleged child sexual abuse occurred in approximately 2013 or 2014, the substantive statutes and regulations of that time govern the substantive issues. The procedural issues are governed by the statutes and regulations relevant at the time of the investigation and administrative appeal. Except where noted otherwise, citations are to the current version of the Maryland Code.

may include "an evaluation of the parents and the home environment" and "a determination of any needed services." *Id.* § 5-706(d).

A local department of social services must select one of three dispositions when it finishes its investigation into a report of child sexual abuse: indicated; ruled out; or unsubstantiated. COMAR 07.02.07.07.A(2). Where there is unsuccessfully refuted, credible evidence, the department will report that the claim of abuse is "indicated." FL § 5-701(m) (2017). Where the investigation reveals that the abuse did not occur, the department will report that the claim is "ruled out." *Id.* § 5-701(w). And, where there is insufficient evidence for the department to find that the alleged abuse is either "indicated" or "ruled out," the department will report that the claim is "unsubstantiated." *Id.* § 5-701(aa). Where the disposition is "indicated" or "unsubstantiated," the department must identify the alleged abuser. FL § 5-706.1. The alleged abuser may then request a hearing before an Administrative Law Judge, who has the authority to affirm or modify the department's disposition. *Id*.

On October 25, 2018, the Prince George's County Department of Social Services received notice from a mandated reporter[3] that A.B., then sixteen years old, had disclosed that approximately five years earlier, "when she was living with her grandmother, that

---

[3] A mandated reporter is a "health practitioner, police officer, educator, or human service worker, acting in a professional capacity," who has reason to believe that a child has been sexually abused. FL § 5-704(a)(1) (2013); COMAR 07.02.07.02(B)(33) (2017). The mandated reporter's identity was not disclosed in this record. COMAR 07.02.07.21(H).

[Taharaka] took down her pants and raped her." This information is recorded on an "Intake Worksheet" that was produced by the Department and is contained in the record. At the time of the alleged abuse, Taharaka was A.B.'s grandmother's boyfriend. A.B. lived with her grandmother both when the alleged abuse occurred and when she reported the abuse. By the time A.B. reported the abuse, Taharaka and A.B.'s grandmother had long since ended their relationship.

On October 26th, the Department conducted a brief "minimal facts interview"[4] with A.B. at her high school, at which A.B. disclosed that when she was 10 to 12 years old and home alone with Taharaka, he "ate her vagina." A.B. also alleged that she had disclosed the abuse to her previous guardian, who was not her grandmother, in August of 2018, and had recently disclosed the abuse to her therapist. A.B.'s statements during that minimal facts interview were reduced to a writing produced and signed by Elaine Byfield, a Department social worker, and that is contained in the record.

---

[4] The minimal facts interview, also called the initial interview, is a department's first contact with the alleged victim after a report of child sexual abuse is received. FL § 5-706(c) (2017).

3

On December 14th, the Department conducted a full forensic interview[5] of A.B. at its Child Advocacy Center.[6] The forensic interview was conducted by a specially trained, neutral Department social worker who, by design, had no prior knowledge of the victim, perpetrator, or allegations. The interview was videorecorded in its entirety and that video was later introduced at the hearing. In it, A.B. described the abuse in greater detail. She stated that while she sat on the couch in her grandmother's basement, Taharaka sat on the floor in front of the couch, pulled down her pants, and kept trying to open her legs and put his fingers in her groin area, and "in [her] vagina." A.B. reported that she tried to push him away and said "no." According to A.B., Taharaka did not stop, touched the outside of her

[5] The forensic interview's purpose is to gather information to determine whether the child sexual abuse occurred and, if so, the nature of the allegations. MD. CODE, CRIM. PROC. ("CP") § 11-928(d)(3)(iii) (stating that forensic interviews are neutral, fact-finding, and designed to avoid duplicative interviewing). The information gleaned is then used, among other things, to assist with the response to or investigation of child sexual abuse by local departments of social services and law enforcement. *Id.* § 11-928(b).

[6] Child Advocacy Centers are child-centered facilities created to provide a trauma-focused, evidence-based, and multidisciplinary response to child abuse victims through investigations, medical and mental health treatment, and victim services. Nat'l Children's All., *Putting Standards into Practice: A Guide for Implementing the 2023 National Standards of Accreditation for Children's Advocacy Centers* 5 (2021), (https://perma.cc/T9NU-U9PJ). The Centers coordinate with local agencies to create a multidisciplinary team consisting of law enforcement, prosecutors, child protective services, medical and mental health professionals, and victim advocates. CP § 11-928(b)(3). There is a Center in each county in Maryland. Most of the Child Advocacy Centers are physically located within local departments of social services and are accredited by the National Children's Alliance, the national parent organization, following fulfillment of ten core standards. Nat'l Children's All., *National Standards of Accreditation for Children's Advocacy Centers* (2021), (https://perma.cc/BLJ7-HRR2) (describing the 2023 standards for accreditation or periodic reaccreditation, including standards concerning forensic interviewing, victim support and advocacy, medical evaluations, case review and coordination, and more).

vagina, and then, pulled her underwear to the side, "put his face there," and began "licking her vagina." Allegedly, Taharaka then stood up and unbuckled his pants, which A.B. perceived as a signal that he wanted her to "suck his penis." A.B. stated that she turned her face away from him, and again said "no." At that point, Taharaka left the basement and went back upstairs. A.B. stated that this was the only time Taharaka sexually abused her. After A.B.'s videorecorded forensic interview, A.B.'s grandmother was reported to be "ambivalent about [A.B.'s] disclosure [and] could not understand why [A.B. had] never [previously] disclosed the abuse."

Following the videorecorded forensic interview, the Department reported:

> This investigation is being closed INDICATED, with [Taharaka] identified as the alleged [abuser]. A finding of indicated child sexual abuse is appropriate if there is credible evidence, which has not been satisfactorily refuted. A preponderance of the evidence was presented during the investigation to support the allegations [A.B.] disclosed one incident of sexual abuse by [Taharaka]. [A.B.] has not had contact with [Taharaka] in a few years and does not appear to have any motivation to make up the allegations. [A.B.] did not exaggerate her disclosure (i.e.- multiple incidents) …. Based on the aforementioned, the Department has credible evidence supporting child sexual abuse and the finding of indicated is appropriate at this time. The criminal investigation is ongoing … [and] [a]s a result, this worker is unable to interview [Taharaka] prior to the close of this case. [Taharaka] will be interviewed by [law enforcement].

At the close of the investigation, the Department notified Taharaka that he was found responsible for "indicated child sexual abuse," and explained that he was entitled to a hearing before an ALJ. Taharaka requested a hearing.

5

During the hearing, A.B. did not testify. Instead, the ALJ reviewed the Department's reports, described above, and heard testimony from the social worker, Elaine Byfield. Taharaka also testified, as did Taharaka's sister, who testified that her brother had a reputation for truthfulness. After the hearing, the ALJ viewed the videorecorded forensic interview several times.

The ALJ then issued a written decision in which he found that the Department's evidence regarding the abuse—the original anonymous report from the mandated reporter, and A.B.'s accounts of the abuse as told to the Department during the minimal facts interview and the videorecorded forensic interview—was "of questionable credibility and that [Taharaka] ha[d] satisfactorily refuted that evidence." The ALJ ordered that the Department's disposition that the abuse was "indicated" be changed to "ruled out," and that the identification of Taharaka as the alleged abuser be expunged. *See* FL § 5-707(b). The ALJ's basis for the decision was threefold. *First*, the ALJ found "that [A.B.'s] statements regarding the alleged abuse are not sufficiently reliable to be considered credible evidence of child sexual abuse." *Second*, the ALJ found "that the evidence adduced by the [Department] has been satisfactorily rebutted by the credible testimony of [Taharaka]." And *third*, the ALJ found that the Department had not proven by a preponderance of the evidence that Taharaka was a "regular presence" in A.B.'s

6

grandmother's house, and thus, under the statutory definition, could not have committed child sexual abuse against A.B.[7]

The Department petitioned for judicial review of the ALJ's decision in the Circuit Court for Prince George's County. The Circuit Court, after reviewing the ALJ's written decision and the record, issued an order affirming the ALJ's decision. The Department noted a timely appeal.

## ANALYSIS

In reviewing an administrative appeal, we review the ALJ's decision, not the decision of the circuit court, to affirm, modify, or reverse the ALJ. *See MVA v. Shea*, 415 Md. 1, 17 (2010) ("Our role is not to review the circuit court's judgment, but rather to review the decision of the ALJ.") (cleaned up). We may reverse an administrative decision

---

[7] Under section 5-701(x)(1) of the Family Law Article, to be responsible for child sexual abuse, a person must be "a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." A "household member" includes a person who "is a regular presence in [the] home of a child at the time of the alleged abuse." FL § 5-701(k) (2012); *see also* COMAR 07.02.07.02.B(19) (2013). Thus, if the Department failed to prove that Taharaka was a regular presence in the home, he could not be responsible under this provision of the Code. The purpose of this provision is "to protect children who have been the subject of abuse" by, among other things, providing services for the child and their family. FL § 5-702. These sections of the statute, read together, suggest that the Department's duty to monitor the child's safety, health, and welfare is greatest when the perpetrator may have close, regular contact with the child, as compared to an outsider or stranger. Of course, whether or not someone was a "regular presence in [the] home" for purposes of child sexual abuse under the Family Law Article, they could still be held responsible under criminal provisions. *See, e.g.*, MD. CODE, CRIM. LAW ("CR") § 3-304 (rape in the second degree); § 3-307 (sexual offense in the third degree); § 3-308 (sexual offense in the fourth degree). That, however, is not at issue in this appeal.

7

when a "finding, conclusion, or decision is unconstitutional; … is affected by any other error of law; is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; [or] … is arbitrary or capricious." MD. CODE, STATE GOV'T ("SG"), § 10-222(h)(3); *UPS, Inc. v. People's Counsel for Balt. Cnty.*, 336 Md. 569, 577 (1994). An agency's finding of fact, or mixed finding of fact and law, is unsupported by substantial evidence if it is unreasonable in light of the entire record. *Montgomery Cnty. v. Butler*, 417 Md. 271, 283-85 (2010). An agency decision is arbitrary and capricious where it is unreasonable or without a rational basis. *Md. Dep't of the Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 202 (2019) (citing *Harvey v. Marshall*, 389 Md. 243, 297 (2005); ARNOLD ROCHVARG, MARYLAND ADMINISTRATIVE LAW, § 20.1 at 255 (2011) (stating that arbitrary and capricious review applies to all components of the agency's decision and is not limited to review of the formal record)). "When an agency reaches a decision based on several grounds and one or more is invalid, we must appraise whether the invalid ground may not have infected the entire decision." *State Bd. of Physicians v. Bernstein*, 167 Md. App. 714, 765 (2006) (cleaned up). An administrative order cannot be upheld "unless it is sustainable on the agency's findings and for the reasons stated." *UPS, Inc.*, 336 Md. at 577.

We hold that the ALJ's credibility determination that A.B.'s statements were not credible was arbitrary and capricious. We also hold that the ALJ's evaluation of Taharaka's credibility was based on incomplete information. Finally, we hold that the ALJ's finding that Taharaka could not have committed child sexual abuse because he was not a regular

presence in A.B.'s home was both unsupported by substantial evidence in the record, and arbitrary and capricious. We explain.

## I.   THE ALJ'S DETERMINATION THAT A.B.'S STATEMENTS WERE NOT CREDIBLE WAS ARBITRARY AND CAPRICIOUS.

To affirm the Department's disposition of indicated child sexual abuse, the ALJ must have found, among other things, that there was sexual molestation or exploitation. COMAR 07.02.07.11(2). As noted above, A.B. did not testify during the hearing, and, thus, in considering whether the abuse had occurred, the ALJ reviewed A.B.'s prior statements to the mandated reporter, from the minimal facts interview, and from the videorecorded forensic interview disclosing and describing the abuse she alleged. Although the ALJ admitted into evidence A.B.'s statements from all three sources, his opinion makes clear that he predominantly evaluated the credibility of the statements made by A.B. during the videorecorded forensic interview. Where relevant, the ALJ also compared these statements to A.B.'s accounts of the abuse as told to the mandated reporter and during the minimal facts interview. Accordingly, we will review the ALJ's credibility determination of A.B.'s statements as a whole.

The ALJ recognized that for A.B.'s out-of-court statements to be admissible, they had to satisfy the "tender years" exception to the hearsay rule, MD. CODE, CRIM. PROC. ("CP") § 11-304(e)(2),[8] which allows the admissibility of out-of-court statements in Child

_____

[8] The General Assembly adopted the tender years exception to allow a child's out-of-court statements to be admissible without requiring a child victim to testify. 1988 Md. Laws, chs. 548, 549 (currently codified at CP § 11-304). The exception is intended to

9

in Need of Assistance ("CINA") cases[9] if the statements have "particularized guarantees

of trustworthiness." *Id.*

Thus, to evaluate A.B.'s credibility, the ALJ went through each of the thirteen

statutory factors in the tender years exception.[10] We follow the same format.

**Factor No. 1:**     **"The child victim's personal knowledge of the event"**

Factor No. 1 concerns A.B.'s personal knowledge of the event. The ALJ wrote:

> To the extent that the events occurred, [A.B.] would have
> personal knowledge of the event. However, the alleged events

---

balance the fundamental rights of the accused with the need to protect child victims from further trauma. *Montgomery Cnty. Dep't of Health & Human Servs. v. P.F.*, 137 Md. App. 243, 272 (2001). To determine credibility, courts use a multifactor test to determine the trustworthiness and reliability of a child victim's out-of-court statement. CP § 11-304(e)(2). This same multifactor test was repurposed by this Court for use by ALJs in administrative hearings to evaluate the credibility of statements by child victims of any age when disclosing and describing allegations of child sexual abuse. *P.F.*, 137 Md. App. at 271-73.

[9] Previously, the tender years exception applied in criminal, juvenile, and CINA cases. 1988 Md. Laws, chs. 548, 549 (criminal only); 1991 Md. Laws, ch. 399 (adding CINA); 1994 Md. Laws, ch. 169 (adding other juvenile proceedings). Because of court rulings and legislative changes, however, the tender years exception now applies only in CINA cases (unless the child victim also testifies at trial). *State v. Snowden*, 385 Md. 64 (2005) (holding that admission of testimonial statements under tender years exception in criminal cases violates federal Confrontation Clause); 2011 Md. Laws, chs. 87, 88 (restricting tender years exception to CINA cases).

[10] As we note in the following discussion, many of these factors are not written in a way that comports with current understandings of the credibility of victims of child sexual abuse. We urge the General Assembly to reconsider both these factors and the manner in which they are expressed. Because we cannot compel the General Assembly to reformulate the factors, and because this panel cannot uncouple the link created by the *P.F.* Court between the factors and ALJs' analysis of the credibility of victims of child sexual abuse, however, we must work with these materials. To the extent possible, therefore, we will use these factors in a manner that is consistent with current understandings regarding trauma-informed credibility assessments. *See Kindley v. Governor of Md.,* 289 Md. 620,

occurred anywhere from three to five years prior to her disclosure. This fact is important in two ways. First, because the alleged incident occurred up to five years ago, [A.B.'s] memory of the incident could be diminished or altered by subsequent events. In addition, the timing of the alleged event by [A.B.] has varied throughout her various reporting of the alleged event. According to the Local Department's evidence, [A.B.] first reported on October 25, 2018 that the event occurred five years prior to the disclosure. However, on October 26, 2018, [A.B.] told the Local Department that the event took place when she was "10-12 y[ears] o[ld]," meaning anywhere from six to four years prior to the disclosure. Finally, during the forensic interview on December 14, 2018, [A.B.] reported that she was twelve or thirteen years old at the time, meaning the event had occurred three or four years earlier. Accordingly, given that she has given different timeframes for the alleged event, and that all of her reports were that the event was at least three, but up to six, years prior to the disclosure, some concern is raised regarding [A.B.'s] memory for the event.

*First*, we agree with the ALJ that "[t]o the extent the events occurred, [A.B.] would have personal knowledge."

*Second*, we see nothing in A.B.'s statements, or anywhere else for that matter, that supports the ALJ's conclusion that A.B.'s memory of the alleged incident "could be diminished or altered by subsequent events." Although it is common knowledge that memories can fade over time, there is nothing in this record to suggest that A.B.'s memories actually have faded.

---

625 (1981) (in interpreting statutes, "we must consider also that our laws are addressed to the future").

*Third*, the ALJ latched on to A.B.'s estimates of the dates when the abuse occurred, found a discrepancy between the dates, and, as a result, found that this factor weighed against A.B.'s credibility. At the minimal facts interview, A.B. initially said that the abuse occurred when she was "ten to twelve years old," and then later reported during the videorecorded forensic interview that the abuse happened when she was "twelve or thirteen years old." The ALJ failed to acknowledge that these windows of time overlapped significantly. In both interviews, A.B. estimated that the abuse occurred when she was around twelve years old. It's not as if she said it happened when she was five, and then said it happened when she was fifteen. This was a minor discrepancy, if it was a discrepancy at all.[11] Moreover, it is unrelated as far as we can tell, to her personal knowledge of the events,

---

[11] A trauma-informed credibility assessment can also recognize that victims of child sexual abuse can't always tell a perfectly coherent narrative. Teena Sorensen & Barbara Snow, *How Children Tell: The Process of Disclosure in Child Sexual Abuse*, 70 CHILD WELFARE 3, 11 (1991) ("Disclosure of child sexual abuse is best described by this research as a process, not an event. The common presumption that most abused children are capable of immediate active disclosure by providing a coherent, detailed account in an initial investigative interview is not supported …."); *cf.* Deborah Epstein, *Discounting Credibility: Doubting the Stories of Women Survivors of Sexual Harassment*, 51 SETON HALL L. REV. 289, 296 (2020) ("PTSD [Post-Traumatic Stress Disorder] inhibits a survivor's ability to link parts of a traumatizing story together; she may not be able to recall events in linear sequence or logically articulate her experience. In addition, an inability to recall key features of the traumatic event is common among those who develop PTSD. This undermines survivors' capacity to produce consistent and fully coherent narratives about their experiences in a way that can easily be improperly attributed to a lack of credibility."); Leigh Goodmark, *When Is a Battered Woman Not a Battered Woman? When She Fights Back*, 20 YALE J.L. & FEMINISM 75, 81-82 (2008) ("Some victims' stories are difficult to follow: The narratives are not linear …."). That is not to say that a factual discrepancy cannot be the basis for a finding that testimony is not credible, rather that a factfinder should consider the possibility that a discrepancy might be caused by trauma and not only by falsehood.

which is the whole point of Factor No. 1. To the extent that the ALJ weighed Factor No. 1 against a finding that A.B.'s statements were credible, we hold that this finding was unsupported by substantial evidence and was, therefore, arbitrary and capricious.

**Factor No. 2:** **"The certainty that the statement was made"**

The ALJ found that it was certain that the statements were made because they were videorecorded. There is no doubt that the ALJ's finding as to Factor No. 2 was reasonable.

**Factor No. 3:** **"Any apparent motive to fabricate or exhibit partiality by the child victim, including interest, bias, corruption, or coercion"**

Factor No. 3 considers whether A.B. had any motive to fabricate the report of child sexual abuse. The ALJ determined that this factor weighed against A.B.'s credibility. Specifically, when A.B. disclosed the abuse, she also disclosed that she was "frustrated with her grandmother" and that she "did not want to live with her grandmother." The ALJ determined that this weighed against A.B.'s credibility because A.B.'s troubled relationship with her grandmother "could have been a potential motive for [her] to fabricate

13

the disclosure." Although we might not have counted it as the ALJ did, we perceive the

ALJ's analysis here to be reasonable.[12]

> ### Factor No. 4:    "Whether the statement was spontaneous or directly responsive to questions"

Factor No. 4 considers whether A.B.'s report of child sexual abuse was spontaneous

or came in response to questions. The ALJ wrote that "[d]uring the [videorecorded]

_____

[12] This is a complex issue, and those considering the credibility of children reporting sexual abuse should consider all of the ways that familial issues affect child sexual abuse and reporting. While difficulties at home may provide a motive to fabricate a report, social science also indicates that children who experience family dysfunction are both (1) more likely to experience sexual abuse and (2) more likely to delay disclosure or not disclose their sexual abuse at all. Carl Göran Svedin, Christina Back, & Siv-Britt Söderback, *Family Relations, Family Climate[,] and Sexual Abuse*, 56 NORDIC J. PSYCHIATRY 355, 361 (2002) (finding that child sexual abuse was highly linked to family dysfunction and that "delayed disclosures … or the absence of disclosure … during childhood illustrate how difficult it is for children to come forward and tell about sexual abuse"); *see also* Verena Schönbucher, Thomas Maier, Meichun Mohler-Kuo, Ulrich Schnyder, & Markus A. Landolt, *Disclosure of Child Sexual Abuse by Adolescents: A Qualitative In-Depth Study*, 27 J. INTERPERSONAL VIOLENCE 3486, 3505-06 (2012) ("[I]t is reasonable to conclude that a reliable relationship with parents may be one of the most important predictors of disclosure to parents …. [P]articipants whose parents were still living together … were more likely to disclose [child sexual abuse] … to their parents than were participants whose parents were divorced or separated …. [N]ondisclosure toward parents is often hindered by impaired quality of the parent-child relationship[;] this finding again supports the hypothesis that disrupted family relationships or family distress in general can encourage a child to keep the [child sexual abuse] a secret."); *cf.* Diana M. Elliott & John Briere, *Forensic Sexual Abuse Evaluations of Older Children: Disclosures and Symptomatology*, 12 BEHAV. SCI. & L. 261, 274 (1994) (finding that maternal nonsupport was a predictor of a child's nondisclosure of abuse, and that a mother's willingness to believe her child is related to her relationship with the perpetrator); Louanne Lawson & Mark Chaffin, *False Negatives in Sexual Abuse Disclosure Interviews: Incidence and Influence of Caretaker's Belief in Abuse in Cases of Accidental Abuse Discovery by Diagnosis of STD*, 7 J. INTERPERSONAL VIOLENCE 532 (1993) (finding that caretaker support and belief in the allegations is strongly associated with disclosure); Gisela Priebe & Carl Göran Svedin, *Child Sexual Abuse is Largely Hidden from the Adult Society: An Epidemiological Study*

forensic interview, [A.B.] did not spontaneously report the abuse; rather, [A.B.] had to be prompted … to tell her story." There was, however, nothing in the record suggesting that A.B.'s initial disclosure of the abuse to the mandated reporter—that led to the minimal facts interview and then to the videorecorded forensic interview—was anything other than spontaneous. The fact that A.B. was prompted to tell her story during the videorecorded forensic interview, an interview scheduled for the very purpose of eliciting information about the alleged abuse, simply does not support a finding that A.B. lacked credibility.[13] Moreover, the videorecorded forensic interview was the third time A.B. recounted the abuse, and it occurred in a Child Advocacy Center with a neutral interviewer, where interview protocols and methods controlled how the disclosure arose. *See supra* notes 5 & 6. To the extent that the ALJ determined that this factor weighed against a finding of A.B.'s credibility, it was arbitrary and capricious.

---

*of Adolescents' Disclosures*, 32 CHILD ABUSE & NEGLECT 1095, 1100 (2008) ("Girl non-disclosers more often perceived their parents as less caring … than girl disclosers."). Thus, judges and ALJs evaluating an alleged victim's motive to fabricate should take into consideration the various ways in which difficulties at home can affect reporting.

[13] Again, a trauma-informed credibility assessment would consider that victims of child sexual abuse tell their stories in different ways. *See supra* note 11. Whether it was told spontaneously or only after prompting does not necessarily affect credibility. Rosaleen McElvaney, *Disclosure of Child Sexual Abuse: Delays, Non-Disclosure[,] and Partial Disclosure*, 24 CHILD ABUSE REV. 159, 164 (2015) ("Recent research has highlighted the need for children to be asked direct questions to facilitate their disclosure. Of those children who did disclose, significant proportions disclosed following prompts rather than it being initiated by the child."). We also note that approved methodologies for questioning the victims of abuse have changed as is discussed at note 19. While we are not free to disregard this statutory factor, *see supra* note 10, neither are we willing to exaggerate its importance.

<u>Factor No. 5:</u>　　　**"The timing of the statement"**

Factor No. 5 looks at the timing of A.B.'s statement. The ALJ seems to have weighed this factor against A.B.'s credibility. The ALJ wrote, "the disclosure occurred at a time when [A.B.] was having difficulties with her grandmother … [and A.B.] never told her grandmother or teenaged aunt, with whom she lived at the time [about the abuse]." The ALJ faulted A.B. for not reporting the child sexual abuse when it occurred, and for having "difficulties with her grandmother" at the time she made the report.

By including it in this list of factors, the General Assembly tells us that the timing of a child's statement may, in the appropriate circumstances, be relevant to evaluating the child's credibility. CP § 11-304(e)(2); *P.F.*, 137 Md. App. at 272. Great care must be used in applying this factor, however, because social science reveals that the victims of child sexual abuse often do not report sexual abuse until they're older, if they ever decide to report the abuse at all.[14] The timing of a child's statement may sometimes be relevant in

_____

[14] Thomas D. Lyon, *Abuse Disclosure: What Adults Can Tell*, in CHILDREN AS VICTIMS, WITNESSES, AND OFFENDERS: PSYCHOLOGICAL SCIENCE AND THE LAW 19 (Bette L. Bottoms, Cynthia J. Najdowski, & Gail S. Goodman eds., 2009) (stating that most sexual abuse is not disclosed during childhood, especially in cases of intrafamilial abuse); Sharon Lamb & Susan Edgar-Smith, *Aspects of Disclosure: Mediators of Outcome of Childhood Sexual Abuse*, 9 J. INTERPERSONAL VIOLENCE 307, 316 (1994) (finding that the mean age for first disclosure of childhood sexual abuse was 18.02 years and that this length of time was not related to "severity, frequency, duration of abuse, or perpetrator relationship"); McElvaney, at 160 (2015) ("There is consensus in the research literature that most people who experience sexual abuse in childhood do not disclose this abuse until adulthood, and when disclosure does occur in childhood, significant delays are common."); Daniel W. Smith, Elizabeth J. Letourneau, Benjamin E. Saunders, Dean G. Kilpatrick, Heidi S. Resnick, & Connie L. Best, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 273, 278, 283 (2000) (finding that 28% of

16

judging their credibility, *see supra* note 10, but given the variety of experience, can rarely be dispositive.

On our review of the facts and circumstances in this case, we see nothing in the timing of A.B.'s reporting that would have made her claims more or less credible. Moreover, although we find that it was not necessarily unreasonable for the ALJ to rely on A.B.'s poor relationship with her grandmother, we note that adolescents often have "difficulties" with their parents, grandparents, and legal guardians. While it may have been appropriate to consider these "difficulties" in connection with Factor No. 3, above, concerning a possible motive to fabricate, *also* counting these relationship difficulties against her in Factor No. 5 puts too much emphasis on a relatively minor point.[15] We hold

---

child rape victims reported never having told anyone before the research interview and that "[t]his suggests that children who actually do disclose rape experiences relatively quickly are atypical, and that professionals should not be surprised when girls and women make initial disclosures of rape several months, even years, after the reported rape took place"); Georgia M. Winters, Niki Colombino, Sarah Schaaf, Anniken L. W. Laake, Elizabeth L. Jeglic, & Cynthia Calkins, *Why do Child Sexual Abuse Victims Not Tell Anyone About Their Abuse? An Exploration of Factors that Prevent and Promote Disclosure*, 38 BEHAV. SCI. & L. 586, 598 (2020) (finding that, out of 105 instances of child sexual abuse, over 90% were never formally reported to law enforcement). *But see* Tina B. Goodman-Brown, Robin S. Edelstein, Gail S. Goodman, David P.H. Jones, & David S. Gordon, *Why Children Tell: A Model of Children's Disclosure of Sexual Abuse*, 27 CHILD ABUSE & NEGLECT 525, 533 (2003) (studying alleged child sexual abuse victims whose cases had been referred for prosecution and finding that, out of 200 cases, 42% of the children had disclosed within 48 hours of the last assault).

[15] *See supra* note 12. Again, those considering the credibility of children reporting sexual abuse should be careful when weighing how timing of the report is affected by family dynamics. *Cf.* Sorensen & Snow, at 13 (1991) ("Common thought has held that [a] teenager who is restricted or punished may become angry and falsely accuse a parent of abuse …, but the data, in contrast, suggest that the anger at parental restrictions serves to override inhibitions and fears and becomes the fuel that drives the adolescent to disclose.").

that, to the extent that the ALJ's analysis of this factor weighed against A.B.'s credibility, it was arbitrary and capricious.

> **Factors No. 6 & 7:** **"Whether the child victim's young age makes it unlikely that the child victim fabricated the statement that represents a graphic, detailed account beyond the child victim's expected knowledge and experience" and "the appropriateness of the terminology of the statement to the child victim's age"**

The ALJ determined that, because A.B. was sixteen when she disclosed and described the child sexual abuse, "the language [A.B.] used and details related by [A.B.] were not particularly beyond [A.B.'s] knowledge and experience at the time she made the disclosure." We perceive the ALJ's analysis here to be reasonable.[16]

> **Factor No. 8:** **"The nature and duration of the abuse or neglect"**

Factor No. 8 concerns the nature and duration of the abuse and neglect. Here, the ALJ wrote:

> [T]he alleged sexual abuse was claimed to have occurred only one time, despite the fact that [Taharaka] continued to be in a relationship with [A.B.'s] grandmother for up to a year after the alleged sexual abuse. Further, the sexual abuse involved [Taharaka's] alleged fondling and licking of [A.B.'s] vagina, and did not include any alleged contact with [Taharaka's] genitalia, forced or otherwise. Indeed, [A.B.] reported that [Taharaka] simply walked back upstairs when [A.B.] turned her head as he was allegedly unbuckling his pants. Further, no requests or threats were made by [Taharaka] for [A.B.] to keep silent regarding the alleged sexual abuse. The Local

---

[16] We note that the General Assembly split what had been Factor No. 6 in previous iterations into Factors No. 6 and No. 7 in the current CP § 11-304. At the time *P.F.* was written, this was only Factor No. 6. 137 Md. App. at 272. We've renumbered the factors to reflect their current numbering in CP § 11-304.

18

> Department did not present any testimony or evidence that one-time sexual abuse of this nature, coupled with a lack of threat or request for silence, was typical or otherwise consistent with other cases of sexual abuse.

The ALJ's analysis here was unreasonable. The ALJ found A.B.'s credibility lacking under this factor because the alleged child sexual abuse occurred only once, and because Taharaka engaged in cunnilingus on A.B. but did not force A.B. to engage in fellatio on him. We disagree that the fact that the alleged abuse happened only once and involved only one sex act, makes A.B.'s account of the alleged abuse any less credible.

There can be no doubt that sometimes people who engage in child sexual abuse only do it once. Similarly, there can be no doubt that sometimes people who engage in child sexual abuse perform oral sexual acts on their victims. That these can and do occur is irrefutable. That the ALJ found these aspects of the abuse unusual, however, does not make A.B.'s report less than credible. And to have found that they do is simply a misapplication of Factor No. 8.

Moreover, if such an interpretation was adopted, it would, in effect, give abusers one free opportunity to sexually abuse a child. Obviously, A.B.'s story would have been different and arguably more compelling had there been multiple instances of child sexual abuse. But the fact that there was only one reported incident does not detract from the credibility of A.B.'s statements.

The ALJ's analysis here also implies that if an alleged abuser doesn't do something that other abusers do, like telling a victim to stay silent, there will be a presumption that the abuse didn't happen. This misplaces the burden of proof and puts a victim at the mercy

19

of the typicality of their abuser's action or inaction. Were this the case, any report of child sexual abuse that differed from the archetypal sexual abuse would undermine the credibility of the child disclosing the abuse. This cannot be the law. Rather, it is an erroneous application of Factor No. 8. Thus, the ALJ's analysis that Factor No. 8 weighed against A.B.'s credibility was arbitrary and capricious.

Factor No. 9: "The inner consistency and coherence of the statement"

Factor No. 9 looks at the inner consistency and coherence of the statement. Here, the ALJ wrote:

> [The Department's social worker, Elaine Byfield] testified that this factor weighed in favor of the credibility of [A.B.'s] disclosure because [A.B.] had given similar reports during [the minimal facts] interview and during the forensic interview. It is true that [A.B.] had reported that there had been contact between [Taharaka's] mouth and [A.B.'s] vagina during both [the minimal facts] interview and the forensic interview. However, there were other inconsistencies that were seemingly ignored by the Local Department. [A.B.'s] report concerning the timing of the event was different during each report. In addition, there are inconsistencies in [A.B.'s] report of the events that allegedly occurred. Specifically, the [mandated] reporter indicated that [A.B.] had reported that [Taharaka] had pulled down [her] "pants and raped her." During [the minimal facts] interview, [A.B.] reported that [Taharaka] "ate her vagina." Finally, during the forensic interview, [A.B.] reported that [Taharaka] had not only performed oral sex on [her], but had also digitally fondled [A.B.] and also tried to make her "suck his penis." None of these additional details were mentioned during the initial report or during [the minimal facts] interview and represent a significant embellishment of the alleged event.

To the extent the ALJ determined that Factor No. 9 weighed against A.B.'s credibility, we hold that it was unsupported by substantial evidence and was arbitrary and capricious.

*First*, on our review of A.B.'s report, we do not see the inconsistencies and "significant embellishment" that the ALJ saw. Rather, we see that A.B. included more details of the alleged child sexual abuse in the videorecorded forensic interview than she did in the minimal facts interview and more details in the minimal facts interview than she provided to the mandated reporter in the initial report. But her story did not change. Rather, we observe a progression in detail as the interviews became more detailed. That's how the process is supposed to work—not proof of inconsistency.[17] *See supra* notes 5 & 6.

*Second*, the ALJ found A.B.'s use of the word "rape" was inconsistent with her other descriptions of Taharaka's acts. Specifically, the ALJ noted that the initial report from the mandated reporter used the word "rape" to describe Taharaka's acts, while in the minimal facts interview and the videorecorded forensic interview A.B. described acts of cunnilingus, digital fondling, and attempted fellatio, as we have related above. We don't

---

[17] Here, again, the factors given to us by the General Assembly are not completely consistent with trauma-informed credibility assessments. Social science indicates that child sexual abuse victims' statements aren't always linear or internally consistent. *See supra* note 11; *see also* Emily Denne, Colleen Sullivan, Kyle Ernest, & Stacia N. Stolzenberg, *Assessing Children's Credibility in Courtroom Investigations of Alleged Child Sexual Abuse: Suggestibility, Plausibility, and Consistency*, CHILD MALTREATMENT May 2020, at 7 ("There are numerous factors that contribute to inconsistencies in disclosure that are not evidence of false accusation."). Factfinders should be careful to consider at least the possibility that inconsistencies in a child sexual abuse victim's report are the result of trauma and not proof of a false report.

see this as an inconsistency, first because A.B. used the word "rape" consistently, both as reported in the mandated reporter's account and again during her videorecorded forensic interview. There was no inconsistency. Secondly, as a legal matter, A.B. used the term correctly. Maryland law defines the term "rape" as any "sexual act," MD. CODE, CRIM. LAW ("CR") § 3-303, which includes, among other things, "cunnilingus," and "an act in which … part of an individual's body penetrates, however slightly, into another individual's genital opening." CR § 3-301(d)(1). *See also Rape*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1030 (11th ed. 2014) (defining rape as "unlawful sexual activity"); *see also Acker v. State*, 219 Md. App. 210, 216-17, 218 n.7 (2014) (reporting that child victim told others that she had been "raped" but meant that defendant touched her inappropriately). When A.B. used the word "rape," it was a proper use of the term. To the extent that the ALJ discounted A.B.'s credibility because of this word choice, that was an insufficient factual basis to undermine the credibility and coherence of the statement.

We hold that the ALJ's decision to count Factor No. 9 against A.B.'s credibility because he thought her progression in detail and varied word choice describing the alleged abuse inconsistent was unsupported by substantial evidence and was arbitrary and capricious.

> **Factor No. 10:** **"Whether the child victim was suffering pain or distress when making the statement"**

Factor No. 10 looks at whether the child was suffering pain or distress when reporting the child sexual abuse. After watching the video of the forensic interview, the ALJ determined that, "[w]hile [A.B.] appeared shy and reluctant to talk during the

22

interview, her demeanor did not appear to change significantly when she went from talking about mundane issues, such as the composition of her household, to when she described the alleged sexual abuse." In effect, the ALJ found that because A.B.'s affect remained calm, she was less credible.

Social science reveals that the ALJ's assumptions about how a victim of child sexual abuse *should* react are misguided:

- The ALJ found A.B. was not emotional in recounting the abuse and counted that lack of emotion against her credibility. Studies reveal, however, that children often "exhibit little emotion when disclosing abuse." Stacia N. Stolzenberg, Shanna Williams, Kelly McWilliams, Catherine Liang, & Thomas D. Lyon, *The Utility of Direct Questions in Eliciting Subjective Content from Children Disclosing Sexual Abuse*, 116 CHILD ABUSE & NEGLECT 103964, at 4 (2021). And trauma-related studies have found that victims of child sexual abuse present in varying ways and may not appear distressed. Kathryn Rowsell & Melissa F. Colloff, *Are Sad Children More Believable? A Systematic Review of the Relationship Between Emotional [Demeanor] of Child Victims and Juror Credibility [Judgments]*, PSYCHOL., CRIME & L. Sep. 30, 2021, at 3.[18]

---

[18] Worse, the same studies reveal that when children fail to exhibit emotion during their abuse disclosures, they are less likely to be viewed as credible by police officers, prosecutors, and judges. Stolzenberg et al., at 4 (2021); *see also* Rowsell & Colloff, at 11 (2021) (stating that "an emotional child is more likely to be regarded as credible than a child who is presenting neutrally") (citing Alexia Cooper, Jodi A. Quas, & Kyndra C. Cleveland, *The Emotional Child Victims: Effects on Juror Decision-Making*, 32 BEHAV. SCI. & L. 813 (2014); Jonathan M. Golding, Heather M. Fryman, Dorothy F. Marsil, & John A. Yozwiak, *Big Girls Don't Cry: The Effect of Child Witness [Demeanor] on Juror Decisions in a Child Sexual Abuse Trial*, 27 CHILD ABUSE & NEGLECT 1311 (2003); Sara Landström, Karl Ask, Charlotte Sommar, & Rebecca Willén, *Children's Testimony and the Emotional Victim Effect*, 20 LEGAL & CRIMINOLOGICAL PSYCHOL. 365 (2015); Pamela C. Regan & Sheri J. Baker, *The Impact of Child Witness Demeanor on Perceived Credibility and Trial Outcome in Sexual Abuse Cases*, 13 J. FAM. VIOLENCE 187 (1998)). That isn't the children's fault, it's ours. This type of credibility assessment is called the

- The ALJ found that A.B.'s affect did not change when the conversation turned from the mundane to the topic of her abuse and found that the lack of change counted against her credibility. But studies have also found that "children's expressiveness during their testimony [often] changed little between abuse and non-abuse topics." Stolzenberg et al., at 4 (2021) (citing ELLEN GRAY, UNEQUAL JUSTICE: THE PROSECUTION OF CHILD SEXUAL ABUSE, (Free Press 1993)).

- The ALJ found that A.B. appeared "shy and reluctant to talk" and concluded that this reluctance undermined her credibility. Reluctance to speak, however, is another well-documented phenomenon among children who have been sexually abused. Stolzenberg et al., at 7 (2021) (discussing how maltreated children "use fewer emotion words when discussing negative events" and how children experiencing greater anxiety during events later use "fewer evaluative terms or emotion words" when describing the events) (first citing Elizabeth C. Ahern & Thomas D. Lyon, *Facilitating Maltreated Children's Use of Emotional Language*, 3 J. FORENSIC SOC. WORK 176 (2013); then citing Andrea Follmer Greenhoot, Rebecca Johnson, & Laura A. McCloskey, *Internal States Language in the Childhood Recollections of Adolescents with and Without Abuse Histories*, 6 J. COGNITION & DEV. 547 (2005); Carole Peterson & Marleen Biggs, *Stiches and Casts: Emotionality and Narrative Coherence*, 8 NARRATIVE INQUIRY 51 (1998)).

In all three of these ways, the ALJ misapplied Factor No. 10. Although pain or distress can reveal or demonstrate credibility, it is inconsistent with current understandings and therefore unreasonable to hold that the *absence* of visible pain or distress undermines credibility. This is a misapplication of Factor No. 10, was legally incorrect and, therefore, arbitrary and capricious.

---

"emotional victim effect," and is problematic because "[a] victim's emotional presentation is not a reliable indicator of their accuracy or truthfulness." Rowsell & Colloff, *supra*, at 3.

**Factor No. 11:** **"Whether extrinsic evidence exists to show the defendant or child respondent had an opportunity to commit the act complained of in the child victim's statement"**

Factor No. 11 considers whether there was extrinsic evidence that the abuser had the opportunity to commit the abuse. The ALJ acknowledged that Taharaka "would occasionally stay over at [A.B.'s] grandmother's house and that he would sometimes tutor [A.B.]" Nonetheless, the ALJ determined that "other than the allegation regarding the one occurrence of alleged abuse, there was *no evidence* submitted at the hearing that [Taharaka] was ever left alone with [A.B.]" (emphasis added). There was, however, significant evidence in this record (some of which came from Taharaka himself) that Taharaka tutored A.B., took A.B. shopping, and was left alone with A.B. The ALJ's finding with respect to Factor No. 11 was unsupported by substantial evidence and was arbitrary and capricious.

**Factor No. 12:** **"Whether the statement was suggested by the use of leading questions"**

The ALJ found that the questions used by the interviewer were not leading. While we may not have considered Factor No. 12 as the ALJ did,[19] we hold the ALJ's finding here to be reasonable.

––––––––––––––

[19] Application of Factor No. 12 presents a difficult question. Obviously, leading questions that suggest the answers can and should undermine credibility. But we would err if, in criticizing leading questions, we were too zealous and also threw out the leading questions that can appear as part of guided forensic interview formats that social science now recommends as the best way to interview children about possible sexual abuse. *See supra* note 13; Stolzenberg et al., at 7 (2021) ("[C]hildren may need to be asked specific questions … to be able to describe their reactions to abuse."). For more information about

25

We agree with the Department and hold that the ALJ's assessment of A.B.'s credibility based on the twelve factors above was arbitrary and capricious.[20] While the ALJ's evaluation of some of the factors was reasonable, his evaluation of many of them was not. We hold that the ALJ's evaluation of three factors: personal knowledge of the event (Factor No. 1); inner consistency and coherence of the statement (Factor No. 9); and opportunity to commit the act (Factor No. 11), in each case was both unsupported by substantial evidence, and arbitrary and capricious. We also hold that the ALJ's evaluation of four factors: the spontaneity of the statement (Factor No. 4); the timing of the statement (Factor No. 5); the nature and duration of the abuse (Factor No. 8); and suffering pain or distress while making the statement (Factor No. 10), were each arbitrary and capricious. Each of these evaluations alone is sufficient to establish overall error. *See Bernstein*, 167 Md. App. at 765. Cumulatively, the ALJ's ultimate conclusion that the factors supported a finding that A.B.'s statements were not credible was arbitrary and capricious. We remand for a new evaluation of the credibility of A.B.'s statements.

---

trauma-informed forensic interviewing, *see* U.S. DEP'T OF JUSTICE, OFFICE OF JUVENILE JUSTICE & DELINQUENCY PREVENTION, CHILD FORENSIC INTERVIEWING: BEST PRACTICES (Sept. 2015) (describing forensic interview practices); NAT'L INST. OF CHILD HEALTH & HUMAN DEV. PROTOCOL: INTERVIEW GUIDE (2017) (same); Am. Prof'l Soc'y on the Abuse of Children Taskforce, *Forensic Interviewing in Cases of Suspected Child Abuse: Practice Guidelines* (2012), (https://perma.cc/5KFZ-WF3K) (same); Int'l Ass'n of Chiefs of Police, *Successful Trauma Informed Victim Interviewing* (2020), (https://perma.cc/7A2V-4JGW) (same). In considering Factor No. 12, a factfinder should bear in mind that the use of leading questions as part of a guided forensic interview is now recognized as appropriate in interviewing children about sexual abuse.

[20] The ALJ also found Factor No. 13, "the credibility of the person testifying about the statement," was inapplicable. There was no error in that determination.

## II. THE ALJ'S DETERMINATION THAT TAHARAKA WAS CREDIBLE WAS BASED ON INCOMPLETE INFORMATION.

As described above, the ALJ observed Taharaka's testimony in which he denied the sexual assault and found it to be credible. The Department, however, observes that the ALJ's opinion relies, as the sole basis for that credibility finding, on his review of Taharaka's employment history. The ALJ's opinion notes that Taharaka "worked for the Prince George's County Public Schools as a teacher for almost 30 years" and that in that position he had worked closely with children and "had never had a complaint made against him regarding inappropriate behavior." The ALJ also found that Taharaka's past employment—first as an auditor for the Washington Hospital Center, and then as a military policeman with a top-secret clearance—were relevant and supported a finding that Taharaka's testimony was credible.

The Department argues that it is improper for the ALJ to rely exclusively on Taharaka's employment history as a proxy for credibility and, as a result, that the ALJ's finding in this regard was arbitrary and capricious. We have reviewed the cases on which the Department relies, and we hold that those cases do not support so definite a proposition. It is true that the Court of Appeals has held that a factfinder may not give a witness more credence simply because of the witness's occupation. *Moore v. State*, 412 Md. 635, 662 (2010); *Langley v. State*, 281 Md. 337, 349 (1977). The Court of Appeals has also clarified those holdings, however, to say that credibility determinations based on a witness's occupation are improper, as a cause for juror disqualification, when the witness is testifying as a police officer or other *official* witness. *Washington v. State*, 425 Md. 306, 324-25

27

(2012) (holding that voir dire regarding witnesses' occupation was not mandatory when alleged victim and corroborating witness had either served in or been employed by the military because neither witness was testifying in an official capacity). In this case, Taharaka was not testifying in his official capacity as a teacher, auditor, or military policeman. *See id.* at 324 n.4. Rather, he was simply testifying as a lay witness. Therefore, we decline to find the ALJ's determination that Taharaka was credible, based solely on his employment history, was necessarily arbitrary and capricious.

Nevertheless, we are concerned that Taharaka's employment history was the sole basis for the ALJ's credibility determination. Because we are already remanding this case for additional consideration of A.B.'s credibility, we think that justice will best be served by remanding the issue of Taharaka's credibility without affirmance, reversal, or modification, *see* MD. R. 8-604(d), so that the factfinder can make a more holistic appraisal of Taharaka's testimony and demeanor. Such an approach is fairer to the parties and provides a surer basis for a reviewing court to properly assess the ALJ's credibility assessment.

### III.  THE ALJ'S DETERMINATION THAT TAHARAKA WAS NOT A REGULAR PRESENCE IN THE HOME WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD, AND ARBITRARY AND CAPRICIOUS.

As reported above, the ALJ also found that Taharaka was not a regular presence in the home and that, therefore, even if Taharaka had sexually abused A.B., he could not have

committed child sexual abuse under the statute.[21] This conclusion was unsupported by substantial evidence in the record, and arbitrary and capricious. SG § 10-222.[22]

One need not formally live in the same house as the victim to be considered a household member. A household member is "a person who lives with *or* is a regular presence in, a home of a child at the time of the alleged abuse." FL § 5-701(k) (2012) (emphasis added). A regular presence could mean once a week for a year, every day for a month, or once every few days.

The undisputed record reveals that Taharaka was a regular presence in A.B.'s house, and involved in A.B.'s life, even if over the course of his relationship with A.B.'s grandmother he only spent the night at A.B.'s grandmother's house "10-15 times" per year. Taharaka testified that A.B.'s aunt's boyfriend "was over [at A.B.'s grandmother's house] at least three to four days a week, maybe more." Taharaka too, then, must have been at the house at least three to four days a week to have had this knowledge firsthand. Taharaka

---

[21] Maryland law defines child sexual abuse as an act of sexual molestation or exploitation of a child "by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member." FL § 5-701(x)(1) (2012); *see also supra* note 7.

[22] The Department's opening brief does not specifically argue that the ALJ erred in finding Taharaka was not a regular presence in the home for purposes of child sexual abuse, FL § 5-701(x)(1) (2012). This issue was mentioned in Taharaka's opposition brief, which argued that the ALJ was correct in finding Taharaka was not a regular presence in the home and thus not a "household member." The Department's reply brief argued for the first time that this was erroneous. Ordinarily, we will not consider an issue raised for the first time in a reply brief. *Gazunis v. Foster*, 400 Md. 541, 554 (2007) (citing *Jones v. State*, 379 Md. 704, 713 (2004). Notwithstanding this general rule, we exercise our discretion to address this issue. *Id.*

was also present at family events, such as an eighth-grade graduation, a police academy graduation, and a baby shower. Even though Taharaka was not one of A.B.'s relatives, he described his relationship with A.B. as if she was a relative: "It's more or less other members of the family. When I used to take [A.B.] out … I used to take her out with my daughter … we had a wonderful relationship." Taharaka also tutored A.B., because according to Taharaka, "[A.B.] had an issue with mathematics." Taharaka also performed "psychological testing" on A.B. "[t]o determine whether or not she had any psychological issues that dealt with learning." Taharaka's testimony alone establishes that he was more than just an infrequent or irregular houseguest of A.B.'s grandmother.

We hold that the ALJ's determination that Taharaka was not a regular presence in A.B.'s grandmother's home, and thus could not have committed child sexual abuse, was unsupported by substantial evidence in the record. Moreover, this conclusion was arbitrary and capricious. We reverse.[23]

## CONCLUSION

The ALJ's evaluation of the credibility of A.B.'s statements was arbitrary and capricious. The ALJ's evaluation of Taharaka's credibility was based on incomplete information. Moreover, the ALJ's conclusion that Taharaka was not a regular presence in A.B.'s grandmother's home was unsupported by substantial evidence in the record and was

---

[23] To be clear, we hold that Taharaka was a regular presence in the home and therefore within the statutory definition of a household member. We leave to the ALJ to determine on remand whether, while Taharaka was in the home, he committed the acts alleged.

arbitrary and capricious. We, therefore, reverse the Circuit Court's judgment affirming the decision of the Office of Administrative Hearings. We remand the matter to the Circuit Court for Prince George's County with instructions to remand the matter to the Office of Administrative Hearings to enter an order that Taharaka was a regular presence in the home and so that it may take whatever evidence it determines is necessary to reconsider the credibility of the witnesses and their statements and weigh whether to affirm or modify the Department's disposition.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THE CIRCUIT COURT WITH INSTRUCTIONS TO VACATE THE DECISION OF THE OFFICE OF ADMINISTRATIVE HEARINGS AND REMAND THE MATTER TO THAT OFFICE FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS ASSESSED TO APPELLEE.**

31